84 F.3d 1452
 318 U.S.App.D.C. 78
 NOTICE: D.C. Circuit Local Rule 11(c) states that unpublished orders, judgments, and explanatory memoranda may not be cited as precedents, but counsel may refer to unpublished dispositions when the binding or preclusive effect of the disposition, rather than its quality as precedent, is relevant.
ADVANCED COMMUNICATIONS CORPORATION, et al., Appellants,
v.
FEDERAL COMMUNICATIONS COMMISSION, Appellee,
MCI Telecommunications Corporation, et al., Intervenors.
 No. 95-1551, 95-1560 and 95-1561.
 United States Court of Appeals, District of Columbia Circuit.
 May 3, 1996.
Rehearing and Suggestion for Rehearing In Banc Denied June
27, 1996.*
 
 Before BUCKLEY, WILLIAMS and HENDERSON, Circuit Judges.
 JUDGMENT
 PER CURIAM.
 
 
 1
 These appeals were considered on the record from the Federal Communications Commission and on the briefs and oral arguments of the parties. The issues have been accorded full consideration by the court and occasion no need for a published opinion. See D.C.Cir.Rule 36(b). For the reasons stated in the attached memorandum, it is
 
 
 2
 ORDERED AND ADJUDGED that the decision of the Federal Communications Commission be affirmed.
 
 
 3
 The Clerk is directed to withhold issuance of the mandate herein until seven days after disposition of any timely petition for rehearing. See D.C.Cir.Rule 41.
 
 MEMORANDUM
 I.
 
 4
 In 1984, the Federal Communications Commission ("FCC" or "Commission") awarded Advanced Communications Corporation ("ACC") a conditional construction permit to provide direct broadcast satellite ("DBS") service. Under the Commission's DBS rules, a permittee must satisfy two due diligence requirements: First, it must "begin construction or complete contracting for construction of [its satellite system] within one year of the grant of the construction permit"; and second, it must begin operating its system "within six years of the construction permit grant." 47 C.F.R. § 100.19(b). These requirements were designed, inter alia, to ensure the prompt use of DBS spectrum resources.
 
 
 5
 ACC fulfilled the first due diligence requirement, and in 1986 it was awarded orbital slots and channels. ACC failed to meet the second requirement, however, and requested a four-year extension, which the Commission granted in Advanced Communications Corp., 6 FCC Rcd 2269, 2274 (1991).
 
 
 6
 During this extension period, ACC entered into negotiations with another DBS permittee, Echostar Satellite Corporation ("EchoStar"), to form a joint venture for the provision of DBS service. After several years of negotiations, however, the proposal was abandoned. Shortly before the expiration of the extension, ACC entered into an arrangement with Tele-Communications, Inc. ("TCI") and TCI's subsidiary, Tempo DBS, Inc. ("Tempo"), that took two alternative forms. Under the first, ACC would, subject to FCC approval, simply transfer its DBS permit to Tempo in a for-profit sale. In the alternative, under a so-called Capacity Purchase Agreement ("CPA"), TCI would provide two of its satellites "for ACC's use" and would issue to ACC shares of TCI stock worth approximately $45 million, in exchange for which ACC would permanently convey "all of the transponder capacity" of the two satellites back to TCI. The agreement called for ACC's ultimate dissolution and the distribution of the TCI stock to ACC's sole shareholder. Under either arrangement, the satellite transponder capacity would be made available to Primestar Partners, L.P. ("Primestar"), an affiliate of TCI.
 
 
 7
 In August 1994, ACC requested an additional four-year extension within which to construct and launch its DBS system. It also requested permission to assign its permit to Tempo. On April 26, 1995, the FCC's International Bureau denied the request for a second extension, finding that it would not serve the public interest. Advanced Communications Corp., 77 Rad.Reg.2d (P & F) 1160 at p 19 (Int'l Bur.1995) ("Bureau Order "). The Bureau declared ACC's permit "null and void" and dismissed the company's assignment application as moot. Id. at p 21.
 
 
 8
 The Bureau's decision was affirmed by the full Commission in an opinion and order adopted October 16, 1995. Advanced Communications Corp., FCC 95-428 (rel. Oct. 18, 1995) ("Advanced II " or "Order"). The Commission agreed with the Bureau that "ACC had made little progress in construction, launch, and initiation of a DBS system in the past decade--particularly during its four-year extension--and therefore that an [additional] extension was not justified." Id. at p 28 (citing Bureau Order at pp 13-20). It further explained that "ACC's lack of due diligence ha[d] resulted in a warehousing of spectrum from which it [sought] to profit." Id. at p 64. Accordingly, the FCC canceled ACC's construction permit and reclaimed its orbital slots and channel assignments. The FCC subsequently auctioned the reclaimed spectrum for hundreds of millions of dollars.
 
 
 9
 ACC, Tempo, and Primestar ("Appellants") seek review of the Order, asserting a number of claims of which only the following warrant analysis: (1) the decision constituted an arbitrary departure from agency precedent; (2) the FCC failed to provide a reasoned explanation for its decision, which would delay the initiation of new DBS service in contravention of the agency's stated goals; and (3) in deciding whether to grant ACC's extension request, the FCC improperly considered the revenues to be gained from the auction of ACC's orbital slots and channels.
 
 II.
 
 10
 Our review of the Commission's decision is deferential; we will affirm "unless the agency's order was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " Atlantic Tele-Network, Inc. v. FCC, 59 F.3d 1384, 1388 (D.C.Cir.1995) (quoting 5 U.S.C. § 706(2)(A)).
 
 
 11
 With this standard in mind, we turn to appellants' contention that the Commission's revocation of its construction permit was an arbitrary departure from settled Commission precedents and policies. Appellants point to ACC's promotional activities in advancing the development of DBS and contend that ACC's efforts to satisfy its permit requirements were no less diligent than those of other DBS permittees whose extension requests had been granted, and that the FCC failed to explain how ACC's performance differed in any relevant respect from that of the permittees in those other cases.
 
 
 12
 It is elementary that an agency must apply its rules with consistency and may not depart from precedent without a reasoned explanation. See Channel 51 of San Diego, Inc. v. FCC, No. 95-1128, 1996 WL 139413 at * 4 (D.C.Cir. Mar. 29, 1996) ("an agency must conform to its prior decisions or explain the reason for its departure from such precedent") (quoting Gilbert v. NLRB, 56 F.3d 1438, 1445 (D.C.Cir.1995)). We are not persuaded, however, that the Order departed from precedent. Although this was the first instance in which the FCC "denied an extension of time to a DBS permittee for failure to progress toward compliance with the second due diligence requirement," see Advanced II at p 26 (emphasis deleted), in reaching that decision the Commission does not appear to have applied its principles in a manner inconsistent with its precedent.
 
 
 13
 In the Order, the FCC explained that "[w]hile promotional efforts may be laudable, those efforts are not an adequate substitute for the concrete progress toward the construction and operation of a DBS system...." Id. at p 31. This statement is consistent with the Commission's prior decisions, see, e.g., United States Satellite Broadcasting Co., 7 FCC Rcd 7247 at p 17 (1992) ("USSB II ") (noting that the "efforts made by USSB to establish its DBS system 'reveal[ ] no lack of capability or commitment' ") (quoting United States Satellite Broadcasting Co., 3 FCC Rcd 6858, 6860 (1988) ("USSB I ")); and we find no error in the Commission's conclusion that ACC had failed to demonstrate the required "concrete progress." The only efforts to develop a DBS system during the first extension period that appellants were able to cite were ACC's failed negotiations with EchoStar and its successful negotiation of the CPA. See Brief for Appellants at 9-12. The joint venture with EchoStar never came to fruition, and we cannot say that the Commission abused its discretion in failing to credit ACC with the DBS system to be contributed by TCI under the CPA. See Advanced II at p 39 ("the CPA cannot fairly be characterized ... as an arrangement by ACC for the launch, deployment, and operation of its own satellite system") (emphasis added). It is readily apparent that ACC's only real contribution to the CPA was its DBS permit and that it would have a trivial involvement, if any at all, with the resulting system.
 
 
 14
 We reject appellants' contention that the decision in the Order is irreconcilable with other decisions in which the Commission has either granted an extension or allowed a transfer of control. To the contrary, the Commission has articulated sufficiently principled distinctions from these other cases to withstand review. The Order is not inconsistent with USSB II (granting second extension and permitting modification of DBS permit to allow joint use of a satellite) and Dominion Video Satellite, Inc., 8 FCC Rcd 6680 (1993) (granting second time extension), recons. den., FCC 95-421 (Oct. 5, 1995) ("Dominion "). In each of those cases, the DBS permittee had made significantly greater progress in developing its own DBS system than had ACC. See Advanced II at p 49 (permittee in USSB II had "spent more than $23 million for a portion of a satellite ...; arranged to finance the remaining completion and launch costs of the satellite; and ... executed contracts with various suppliers of DBS home receiving systems"); id. at p 25 (permittee in Dominion "had developed a financing program, contracted for home receiving equipment, and obtained a contract for launch services").
 
 
 15
 Directsat Corporation, 10 FCC Rcd 88 (1995), presents a more difficult case. In that decision, the Commission approved the for-profit sale of the permittee's construction permit for an unbuilt DBS system. In the Order, the Commission distinguished Directsat on the ground that "unlike ACC, Directsat did not request an extension of its DBS construction permit," Advanced II at p 56 (emphasis deleted), and that whereas "Directsat's investment in the development of its DBS system had been substantial, and its progress toward actual implementation had been steady and consistent with the schedule established in its construction contract....[,] ACC has consistently delayed the schedule established in its construction contract," id. (internal quotations omitted) (emphasis deleted).
 
 
 16
 Although we fail to see the relevance of the first distinction, see Dissenting Statement of Commissioner James H. Quello at 4, reprinted in Joint Appendix at 46 (it was apparent at the time Directsat filed its transfer application that an extension would be required; and an extension was, in fact, later requested), we find the second both relevant and persuasive. One of the primary purposes of the due diligence rules is to prevent the "warehousing" of spectrum. See Directsat, 10 FCC Rcd at 89 p 4 (due diligence rules "deter permittees from seeking to delay or postpone construction with the expectation that the permit would ... become more valuable and could be sold later at an increased price for profit"). The Commission may reasonably conclude that a permittee that makes steady and consistent progress towards the construction of its DBS system is less likely to be "warehousing" its spectrum than one whose progress is, at best, irregular. Directsat met its construction schedule while ACC regularly missed its promised construction deadlines and payments to its satellite contractor.
 
 
 17
 Next, we reject appellants' claim that the Order should be vacated because the Commission "failed to supply a reasoned explanation for its abrupt departure from [the Commission's] stated goal of ensuring the prompt initiation of DBS service." Brief for Appellants at 43. While the timely initiation of such service is one of the Commission's primary goals, that has never been the sole criterion used to determine whether an extension should be granted to a DBS permittee. Rather, the Commission has considered "[t]he totality of the circumstances--those efforts made and those not made, the difficulties encountered and those overcome, the rights of all parties, and the ultimate goal of service to the public." USSB II, 7 FCC Rcd. at 7249, p 15 (quoting USSB I, 3 FCC Rcd at 6859) (emphasis added). Although enforcement of the due diligence rules may cause delays in the provision of a particular DBS system, the Commission's anti-warehousing policy relies on the enforcement of its due diligence obligations; otherwise, it could not ensure the prompt delivery of DBS service as a general matter. Taken to its logical conclusion, appellants' argument would deny the FCC the ability to revoke a DBS permit irrespective of the permittee's lack of due diligence if the revocation would delay the provision of a given DBS service. Such a result is patently untenable.
 
 
 18
 Finally, we address appellants' contention that the FCC violated 47 U.S.C. § 309(j)(7)(A) by allowing the "expectation of Federal revenues [to play] a large role in [the] decision to deny [ACC's] application." Brief for Appellants at 24 (internal quotations omitted). While the Commission was aware that substantial sums could be realized from the sale of any orbital slots and channels recovered from ACC, see Advanced II at p 67 n. 127 (acknowledging the pledge by MCI to open bidding at $175 million in the event an auction were held), the Order does not base its denial of ACC's renewal application on the expectation of such revenues. Rather, the Commission's decision was predicated on ACC's failure to achieve "any concrete progress toward the actual construction and operation of its DBS system" during its first extension period. Id. at p 37. Appellants are thus asking us to search beyond the text of the Order to find some alleged illicit motivation on the part of the FCC. This we are unwilling to do. "Agency opinions, like judicial opinions, speak for themselves," Checkosky v. SEC, 23 F.3d 452, 489 (D.C.Cir.1994); and appellants have pointed to nothing in the record that is sufficient to overcome the "strong presumption of agency regularity." Louisiana Ass'n of Indep. Producers v. FERC, 958 F.2d 1101, 1111 (D.C.Cir.1992). Of course, we express no opinion as to whether the Commission was in fact barred by law from taking into account the expected impact on federal revenues.
 
 
 
 *
 Circuit Judge Tatel did not participate in the order--For Rehearing In Banc