**ATLANTIC TELE–NETWORK,
INC., Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,**

**American Telephone and Telegraph
Company, Intervenor.**

No. 93–1616.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 6, 1995.

Decided July 25, 1995.

Robert J. Aamoth, Washington, DC, argued the cause and filed the briefs for petitioner. Gertrude Jollek White, Washington, DC, entered an appearance for petitioner.

Michael F. Finn, Counsel, F.C.C. ("FCC"), with whom William E. Kennard, General Counsel, Daniel M. Armstrong, Associate General Counsel, and John E. Ingle, Deputy Associate General Counsel, FCC, and Anne K. Bingaman, Asst. Atty. Gen., and Robert B. Nicholson and Robert J. Wiggers, Attys., U.S. Dept. of Justice, Washington, DC, were on the brief, argued the cause for respondents. James M. Carr and Renee Licht, Attys., FCC, Washington, DC, entered appearances for respondents.

Judith A. Maynes, Basking Ridge, NJ, and Peter D. Keisler, Washington, DC, were on the brief for intervenor. Daniel Stark, Basking Ridge, NJ, entered an appearance for intervenor.

Before BUCKLEY, RANDOLPH, and TATEL, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

Atlantic Tele–Network, Inc. ("ATN") petitions for review of an order of the Federal Communications Commission conditionally authorizing ATN to provide international telephone service between the United States and Guyana. *In re Atlantic Tele–Network, Inc.*, 8 F.C.C.R. 4776 (1993) (*"Commission Order"*). Finding the Commission's conditional authorization proper, we deny the petition.

## I. BACKGROUND

### A. Legal Framework

Section 214 of the Communications Act of 1934 requires telephone operating carriers to secure FCC certification before constructing or operating interstate or international communications lines. That provision specifically provides that

> [n]o carrier shall ... acquire or operate any line, or extension thereof, or shall engage in transmission over or by means of such additional or extended line, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity require or will require the ... operation[ ] of such additional or extended line....

47 U.S.C. § 214(a) (1988). If the Commission approves such an application, it

> may attach to the issuance of the certificate such terms and conditions as in its judgment the public convenience and necessity may require.

47 U.S.C. § 214(c).

This case involves such a condition. An understanding of its nature and purpose requires an overview of how international telephone carriers operate. While several domestic carriers compete to provide telephone service from the United States to foreign countries, typically only one government-controlled carrier provides telephone service in any particular foreign country. When a U.S. customer dials an overseas telephone number, a domestic "originating" carrier charges a "collection rate" for placing the international call through to the appropriate foreign "terminating" carrier, which connects the caller to his destination. The domestic originating carrier and the foreign terminating carrier negotiate an operating agreement that sets forth the "accounting rate" that is divided between the two carriers. For example, if the domestic carrier charges $2.00 per minute as its collection rate, and the two carriers negotiate a $1.00 per minute accounting rate to be divided equally between them, the foreign carrier will receive $.50 per minute as its share of the accounting rate for terminating the call, while the domestic originating carrier will receive $.50 per minute as its share of the accounting rate plus the additional $1.00 per minute differential.

As it is far too cumbersome to make payments every time a call is placed, the operating agreement will provide for payments on a net aggregate basis determined by the flow of originating and terminating traffic. Continuing with our hypothetical, if a domestic carrier originates 500 minutes of calls terminated by the foreign carrier, the domestic carrier would owe the foreign carrier $250 (500 minutes × $.50). Assuming the foreign carrier originates 100 minutes of calls destined for the United States that are terminated by the domestic carrier, the foreign carrier would owe the domestic carrier $50 (100 minutes × $.50). As domestic carriers typically originate more traffic than they terminate, they usually make "net settlement" payments to foreign carriers. In our hypothetical, the domestic carrier would make a net settlement payment of $200 to the foreign carrier.

These operating agreements are subject to anticompetitive abuse. In particular, foreign monopoly carriers have an incentive to allocate "return traffic" to domestic carriers with whom they have favorable operating agreements. The practice of a foreign carrier using its monopoly leverage to play one domestic carrier off the other in order to gain favorable terms and conditions from domestic carriers is known in the industry as "whipsawing." *See In re Implementation and Scope of the Uniform Settlements Policy for Parallel International Communications Routes,* 59 Rad.Reg.2d (P & F) 982, 985 (1986); *In re American Tel. & Tel. Co. v. MCI Telecommunications Corp.,* 9 F.C.C.R. 2688, 2689–90 (1994). Further, a domestic carrier holding a controlling interest in a foreign carrier has an incentive to have the foreign carrier route calls bound for the United States to it, thereby discriminating against its competitors. *See, e.g., In re Regulation of Int'l Common Carrier Services,* 7 F.C.C.R. 577, 581 (1992).

To prevent these practices, the Commission has sought to provide domestic carriers with a unified bargaining position vis-a-vis foreign monopolist carriers. Under its "in-

ternational settlements policy," the FCC has required, as a condition of certification, that operating agreements between domestic and foreign carriers be uniform in all material terms, including accounting rates, settlements, and division of tolls. *See In re Implementation and Scope of the Int'l Settlements Policy for Parallel Int'l Communication Routes,* 2 F.C.C.R. 1118, 1118 (1987).

Imbedded in this policy is a principle known as "proportionate return," *In re Regulation of Int'l Accounting Rates,* 7 F.C.C.R. 8040, 8045–46 (1992), "under which an entity carrying traffic into a country receives outbound traffic from that country in the same proportion as it handled the inbound traffic." *International Record Carriers' Scope of Operations in the Continental United States,* 57 F.C.C.2d 190, 203 (1976). The Commission has not rigidly applied its uniformity requirements, however, in recognition of the fact that competing concerns such as new entry by competitors, lower prices, or greater innovation in service may sometimes militate against such a requirement. *See In re American Tel. & Tel. Co.,* 4 F.C.C.R. 1195, 1196 (1989).

B. ATN's Application

On July 5, 1990, ATN filed a section 214 application with the Commission requesting authority to provide international service between the United States and Guyana. On January 28, 1991, ATN purchased an 80 percent interest in Guyana Telephone & Telegraph Company, Ltd. ("GT & T"), the monopoly telephone carrier in Guyana. The following month, ATN filed a letter with the FCC in which it urged that because it would be making over $100 million of improvements in the Guyanese telecommunications infrastructure, it should be permitted to benefit from the increased return traffic from Guyana that would be generated by its capital improvements. Accordingly, ATN proposed that the Commission allocate the existing level of return traffic to American Telephone & Telegraph—the only domestic carrier then serving the U.S.–Guyana route—and, for a period of at least five years, permit the allocation to ATN of all the return "growth" traffic to the United States above the exist-

ing level without regard to the requirement of a proportionate return. ATN argued that because it was not an established carrier, it would not qualify for any of the return traffic from Guyana under a proportionate return provision and that only those domestic carriers with significant market shares in the United States would have any prospect of doing so.

On October 31, 1991, acting under delegated authority from the Commission, the Common Carrier Bureau found that ATN, through its affiliation with GT & T, had exclusive control over Guyana's facilities and therefore had the ability to discriminate against competing U.S. carriers. *In re Atlantic Tele–Network, Inc.,* 6 F.C.C.R. 6529, 6531 (1991) (*"Bureau Order"*). Therefore, the Bureau conditioned ATN's section 214 authorization on its acceptance of the requirement of proportionate return in order to protect the public interest from any potential anticompetitive consequences that might flow from a misallocation of return traffic. *See id.* at 6532.

In July 1993, the Commission denied ATN's application for review of the Bureau's Order. *Commission Order,* 8 F.C.C.R. 4776 (1993). The Commission held that "ATN's majority interest in GT & T ... gives ATN both the ability and incentive to engage in the very anticompetitive conduct that gave rise to our proportionate return policy." *Id.* at 4778. Although expressing support for privatization initiatives such as that in Guyana, the Commission believed that ATN's investment in Guyana's telephone system did not warrant special treatment, given the potential for anticompetitive conduct. *Id.* at 4780.

II. DISCUSSION

A. Jurisdiction

◼ As an initial matter, the Commission alleges that we lack jurisdiction to consider ATN's petition because one of its regulations, 47 C.F.R. § 1.110 (1994), requires ATN to exhaust its administrative remedies before filing a petition for judicial review. Relying on *Darby v. Cisneros,* — U.S. —, —, 113 S.Ct. 2539, 2545, 125 L.Ed.2d 113 (1993),

ATN maintains that section 1.110 is an optional agency remedy that a party need not exhaust before seeking review of final agency action.

We find that ATN's petition for review is properly before us. Section 1.110 provides that

[w]here the Commission without any hearing grants any application in part, or with ... conditions other than those requested, the action of the Commission shall be considered as a grant of such application unless the applicant shall, within 30 days from the date on which such grant is made or from its effective date if a later date is specified, file with the Commission a written request rejecting the grant as made.

47 C.F.R. § 1.110. In *Central Television, Inc. v. FCC*, 834 F.2d 186 (D.C.Cir.1987), we held that section 1.110 was "a valid exhaustion of administrative remedies rule" that prevented appellants from seeking judicial review of the Commission's conditional grant of an assignment of a radio channel construction permit. *Id.* at 191. In *Central Television*, however, appellants asserted jurisdiction under 47 U.S.C. § 402(b)(3), which provides that appeals may be taken

[b]y any party to an application for authority to transfer, assign, or dispose of any [construction permit or station license] ... whose application is *denied* by the Commission."

47 U.S.C. § 402(b)(3) (1988) (emphasis added); *see Central Television*, 834 F.2d at 189. Because section 1.110 stipulates that a conditional grant will be deemed a "grant" of the application unless it is affirmatively rejected by the applicant, our conclusion that we lacked jurisdiction pursuant to section 402(b)(3) is not surprising.

■ The same principle does not govern ATN's petition. As the Commission concedes, ATN is not applying for a station license or construction permit. Therefore, our jurisdiction is based not on section 402(b), but on section 402(a). Section 402(a) provides that

[a]ny proceeding to ... annul, or suspend any order of the Commission ... (except those appealable under subsection (b) of

this section) shall be brought as provided by and in the manner prescribed, in chapter 158 of Title 28.

47 U.S.C. § 402(a) (1988). Chapter 158 of Title 28 in turn provides that

[t]he court of appeals ... has exclusive jurisdiction to ... set aside, suspend (in whole or in part), or to determine the validity of—(1) all final orders of the Federal Communications Commission made reviewable by section 402(a) of title 47....

28 U.S.C. § 2342 (1988). Because our jurisdiction under section 402(a) is not limited to reviewing a "denial" of ATN's application, section 1.110 poses no obstacle to our review. Section 1.110 specifies the consequences if the applicant does not reject the conditional grant (the Commission's decision is deemed a "grant"); it does not require the applicant to reject the conditional grant as a prerequisite to judicial review. As the Supreme Court held in *Darby*, the Administrative Procedure Act, 5 U.S.C. § 704 (1988), "explicitly requires exhaustion of all intra-agency appeals mandated either by statute or by agency rule," but courts may not "require litigants to exhaust optional appeals as well." *Darby*, —— U.S. at ——, 113 S.Ct. at 2545; *see Career Educ., Inc. v. Department of Educ.*, 6 F.3d 817, 820 (D.C.Cir.1993) (exhaustion requirement may not be imposed by federal court if administrative adjudication is otherwise final and available appeal is only discretionary one). We therefore reject the Commission's jurisdictional challenge.

B. The Commission's Conditional Grant of Authorization

■ We must affirm the Commission's conditional grant of authorization unless the agency's order was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1988). Under the arbitrary and capricious standard, our review is "highly deferential," *National Cable Television Ass'n, Inc. v. FCC*, 747 F.2d 1503, 1507 (D.C.Cir.1984), and we are "not to substitute [our] judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983).

Rather, our "duty is to ensure that the Commission has examined the relevant data and articulated a satisfactory explanation for its action based on the materials that were before the Commission at the time its decision was made." *Florida Cellular Mobil Communications Corp. v. FCC*, 28 F.3d 191, 197 (D.C.Cir.1994) (internal quotation marks and citation omitted).

▮ ATN argues that it was arbitrary and capricious for the Commission to require a proportionate return. Specifically, ATN contends that it is not a dominant carrier, that the Commission assumed incorrectly that it was required by a longstanding Commission policy to impose the condition, that the Commission did not have to do so in order to prevent ATN from abusing its market power, and that it failed to consider other mitigating public interest factors.

At the outset, the parties dispute whether the Commission's proportionate return approach represents formal agency policy. The Commission stated, in its Order, that it "first adopted the proportionate return policy in the 1930s to prevent whipsawing of U.S. carriers by foreign entities" and that this policy remained "in effect at the time the [Common Carrier] Bureau adopted its order...." *Commission Order*, 8 F.C.C.R. at 4778. ATN disputes this conclusion, arguing that nonproportionate allocation is evident in various FCC decisions and that in the late 1980s the Commission proposed, but ultimately declined to adopt, a proportionate return allocation policy to prevent whipsawing. *See In re Regulatory Policies and Int'l Telecommunications*, 2 F.C.C.R. 1022, 1027 (1987); *In re Regulatory Policies and Int'l Telecommunications*, 4 F.C.C.R. 7387, 7431–34 (1988).

▮ We need not resolve this dispute. Congress has granted the Commission the authority to "attach to the issuance of the certificate [of authorization] such terms and conditions as in its judgment the public convenience and necessity may require." 47 U.S.C. § 214(c). Thus, even if the FCC had no formal policy of proportionate return at the time it imposed the condition on ATN's authorization, it had ample authority to require it on an *ad hoc* basis. *Cf. Western*

*Union Tel. Co. v. FCC*, 665 F.2d 1112, 1118 (D.C.Cir.1981) (adoption of open-entry policy disposes of need to address issues on case-by-case basis). As the Commission correctly notes, "even assuming no formal policy existed at the time the condition was imposed, it was well within the Bureau's discretion to impose such a proportionate return requirement as part of its public interest analysis." *Commission Order*, 8 F.C.C.R. at 4778. The question for our review, then, is not whether agency policy mandated the imposition of the condition, but whether the Commission acted arbitrarily and capriciously when it determined that the public convenience and necessity required it.

ATN's argument that the Commission acted arbitrarily is based on a rather formulaic understanding of the Commission's role in protecting the public interest. First, ATN maintains that the sole reason the proportionate return condition was imposed was to protect against whipsawing. Whipsawing, it contends, is a term of art that refers to the practice of a foreign carrier playing competitive domestic carriers against one another to gain benefits for itself. It argues that because there was only one domestic carrier serving the U.S.–Guyana route at the time of ATN's application, whipsawing was impossible. Therefore, ATN reasons, the imposition of a proportionate return requirement was arbitrary and capricious.

We find ATN's syllogism flawed. The Commission imposed the requirement because of ATN's ability and incentive to discriminate against competing domestic carriers.

> A carrier with monopoly control over bottleneck facilities is in a position to whipsaw and *otherwise discriminate* against competing carriers. We believe that the appropriate means of controlling the potential abuse of foreign market power in the instant case is to ... retain the conditions the Bureau applied to ATN's Section 214 authorization.

*Commission Order*, 8 F.C.C.R. at 4779 (emphasis added). GT & T's monopoly control of Guyanese facilities created an opportunity for it to discriminate, and ATN's investment

in GT & T created the incentive to favor ATN over other domestic carriers. With an 80 percent ownership interest in GT & T, ATN is clearly a dominant carrier, *see id.* at 4779 & n. 21; *In re Regulation of Int'l Common Carrier Services,* 7 F.C.C.R. 7331, 7332 (1992) (carrier is dominant when it owns a controlling interest in foreign affiliate that controls bottleneck facilities in foreign market enabling it to discriminate in favor of its U.S. affiliate), and it openly admits that it intended to give preferential treatment to itself to the detriment of other domestic carriers. *See* ATN Application for Review, at 6 ("GTT plans to route ... to ATN all growth traffic attributable to its GTT capital improvements program."). Whether or not this constituted whipsawing, it was not unreasonable for the Commission to conclude that ATN's entrance in the U.S.–Guyana route posed an anticompetitive risk. Absent a more persuasive argument, we see no basis for concluding that the Commission acted arbitrarily and capriciously when, in the exercise of its judgment of what the public convenience and necessity required, it decided to offset that risk by imposing a proportionate return condition.

ATN's strongest argument is that numerous pro-competitive factors militate against a proportionate return requirement. ATN contends that permitting it a disproportionate allocation of return traffic would result in lower collection rates, better service to U.S. customers, and more competition from new entrants in the U.S.–Guyana route. Such an approach would also encourage other U.S. companies to invest in foreign carriers. ATN also argues that a proportionate return requirement overlooks significant barriers to entry in the U.S. market for international calls.

We are sympathetic to these concerns. Indeed, the Commission has previously recognized that pro-competitive factors require some flexibility in the application of its uniformity policies, *see In re American Tel. & Tel. Co.,* 4 F.C.C.R. at 1196, and that the goal of its uniformity policy is "to protect U.S. ratepayers, *not* U.S. carriers." *In re American Tel. & Tel. Co.,* 4 F.C.C.R. 6602, 6607 (1989) (emphasis in original). The Commission has indicated that,

in an effort to encourage entry by new competitors, lower prices and greater innovation in international telecommunications services, the Commission would consider waiver requests concerning the uniformity requirement of its [international settlement policy]. Specifically, the Commission stated that it would consider a variety of factors, including, but not limited to, the possibility of lower collection rates, improved services and increased competition, in determining whether to grant a petition requesting a waiver of the Commission's uniformity requirement.

*In re AT & T,* 4 F.C.C.R. at 1196 (footnote omitted).

■ ATN contends, and the Commission does not dispute, that its entry would provide U.S. customers with lower prices, improved service, and new competition. We have no authority, however, to substitute our judgment for that of the agency; our responsibility is simply to assess whether "the agency's path may reasonably be discerned." *State Farm,* 463 U.S. at 43, 103 S.Ct. at 2867 (quoting *Bowman Transportation, Inc. v. Arkansas–Best Freight System, Inc.,* 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974)). We find that it may.

The Common Carrier Bureau and the Commission were well aware of ATN's assertion that there were insurmountable barriers to entry in the U.S. market for overseas calls. They were also cognizant of ATN's arguments concerning the potential for improved service, lower prices, and increased traffic. *Bureau Order,* 6 F.C.C.R. at 6530–31; *Commission Order,* 8 F.C.C.R. at 4777. Nonetheless, the Commission found that to have allowed a disproportionate return would have presented an unjustified departure from traditional guidelines and an unacceptable anticompetitive risk because of the power that ATN would wield. The Commission thus concluded that the public interest required it to impose the condition on ATN. *Bureau Order,* 6 F.C.C.R. at 6532; *Commission Order,* 8 F.C.C.R. at 4779.

The Commission may not have addressed each of ATN's arguments concerning the competitive benefits that would result from

its breach of the monopoly hitherto enjoyed by AT & T in the U.S.–Guyana service. Nevertheless, in deciding to attach a condition to ATN's certification, the Commission balanced competing interests in furtherance of its estimate of the public convenience and necessity; and it did so with sufficient clarity to enable us to "reasonably discern" from its order the Commission's rationale behind its ultimate balance of these interests. The Commission did not "cross the line from the tolerably terse to the intolerably mute." *Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 852 (D.C.Cir.1970).

### III. CONCLUSION

We have jurisdiction to hear this case because ATN was not required to exhaust all administrative appeals. With respect to the merits, we conclude that the Commission has made "findings related to the pertinent antitrust policies, draw[n] conclusions from those findings, and weigh[ed] these conclusions along with other important public interest considerations." *United States v. FCC,* 652 F.2d 72, 82 (D.C.Cir.1980) (*en banc*). This is all that we require. Accordingly, ATN's petition for review is

*Denied.*