FRESNO MOBILE RADIO,
INC., et al., Petitioners,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents.

Nextel Communications, Inc., Intervenor.

Nos. 97–1459, 97–1460, 97–
1536 and 97–1611.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 16, 1998.

Decided Feb. 5, 1999.

Frederick M. Joyce argued the cause for petitioners Fresno Mobile Radio, et al., and SMR WON. With him on the briefs were Christine McLaughlin and Robert H. Schwaniger, Jr. Dennis C. Brown entered an appearance.

Thomas P. Steindler argued the cause for petitioner Southern Company. With him on the briefs were Carole C. Harris and Christine M. Gill.

Roberta L. Cook, Counsel, Federal Communications Commission, argued the cause for respondents. With her on the brief were Joel I. Klein, Assistant Attorney General, U.S. Department of Justice, Catherine G. O'Sullivan and Marion L. Jetton, Attorneys, Christopher J. Wright, General Counsel, Federal Communications Commission, and John E. Ingle, Deputy Associate General Counsel. Mark S. Popofsky, Attorney, U.S. Department of Justice, and Daniel M. Armstrong, Associate General Counsel, Federal Communications Commission, entered appearances.

Robert S. Foosaner, Michael D. Hays and Michael Kovaka were on the brief for intervenor Nextel Communications, Inc. David E. Mills entered an appearance.

Before: EDWARDS, Chief Judge, WILLIAMS and GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

Before us are petitions for review of two Federal Communications Commission rules creating a new class of radio spectrum licenses for bandwidth in the 800 MHz range. Petitioner Southern Company, which holds numerous licenses in that range, asserts that the rules violate a recently-enacted statute that requires the agency to treat all similarly situated commercial licensees comparably. Petitioners Fresno Mobile Radio, et al., and SMR WON, a trade association of incumbent licensees in the 800 MHz range contend that the Commission, among other things, exceeded its statutory authority when it decided to distribute the new licenses by auction, failed

adequately to protect the interests of small businesses in setting the rules for the auction, and unlawfully modified existing licenses without holding evidentiary hearings. Nextel Communications, Inc., which purchased the great majority of the licenses awarded thus far under the new rules, has intervened in support of the Commission.

We hold that the Commission failed adequately to explain its disparate treatment of incumbent and new licensees, and therefore grant Southern's petition for review. We reject each of the other petitioners' arguments, however, and conclude that the agency acted within its discretion in deciding to allocate the new licenses by auction and otherwise proceeding as it did.

## I. Background

In 1974 the Commission created the Specialized Mobile Radio service. SMR licensees use bandwidth in the 800 MHz and 900 MHz ranges to provide "land mobile communications services" on a commercial basis. 47 C.F.R. § 90.7. Until recently the vast majority of SMR licensees provided local dispatch services for taxis, ambulances, and the like. In the last few years, however, an increasing number of SMR licensees have begun to use their spectrum for more ambitious purposes—in particular, the provision of cellular telephone and data transmission services over a wide area.

At first these licensees faced a difficult regulatory environment. For example, the Commission separately licensed each individual transmitter and small group of channels; that made it expensive and time-consuming for a licensee that wanted to provide cellular telephone, data transmission, or other services to get authorization for the large number of transmitters and channels required for those services. They were also hampered because most of the SMR bandwidth had already been licensed. Furthermore, the Commission's "build out" rule, which obligated the SMR licensee to complete its facility within one year of receiving its license, weighed particularly upon any licensee trying to build a wide area system.

The agency began to respond to these problems in 1993. First, it extended the time for an SMR licensee to build a wide-area broadcasting system to as much as five years. Next, it proposed to offer large blocks of bandwidth and coverage of a large geographic area in a single license. *See* 8 F.C.C.R. 3950 ¶ 7 (1993).

Meanwhile, in August, 1993 the Congress amended § 332 of the Communications Act of 1934 to require the Commission to classify all mobile radio services as either "commercial" or "private." 47 U.S.C. § 332(c). As to certain services that had been considered private under the prior definition but now would be classified as commercial, the Commission was required to promulgate "technical requirements that are comparable to the technical requirements that apply to licensees that are providers of substantially similar [commercial] services." Pub.L. No. 103–66, § 6002(d)(3)(B), 107 Stat. 312 (1993). To fulfill this mandate, the Commission began a new proceeding in which it concluded that SMR licensees offering for-profit interconnected services—*i.e.* those involving both radio and landline telephone communications—are "substantially similar" to cellular telephone and Personal Communication Service (PCS) providers, and should therefore be subject to comparable regulatory regimes.

In order to put SMR on a footing more nearly equal to those of other licensees, the Commission then adopted a system for the upper 200 channels of the SMR bandwidth pursuant to which it would auction off licenses for each of 175 newly-designated "Economic Areas." Each EA license would include a large block of spectrum for the entire geographic area, thereby making transmitter-by-transmitter and channel-by-channel licensing unnecessary. To help EA licensees obtain the contiguous spectrum needed to provide competitive wide-area services, the Commission also determined that any EA licensee shall be able to force any incumbent SMR licensee to relocate to the lower 230 channels of SMR spectrum, provided the EA licensee gives the displaced licensee comparable facilities and spectrum, pays the expenses associated with its relocation, and ensures it a "seamless" transition between the old and new frequencies. The Commission also relaxed the build out rule for EA licen-

sees: Under its new "interim coverage requirement," an EA licensee must provide service to one-third of the population in its area within three years, and to two-thirds of the population within five years, of the award of the license. The agency declined, however, to extend this rule to incumbent SMR licensees. Instead, it gave them a maximum of two years to complete construction of their systems. *See Amendment of Part 90 of the Commission's Rules, First Report and Order,* 11 F.C.C.R. 1463, ¶¶ 105–114 (1995) [First Report and Order].

On reconsideration, the Commission adhered to this new regulatory scheme for the upper 200 channels of SMR bandwidth but changed its pre-existing method for giving small businesses an advantage in the auction process. Specifically, the Commission rescinded its policy of allowing small businesses to pay for licenses in installments, and instead created a system of bidding credits for which only small businesses could qualify. *See Amendment of Part 90 of the Commission's Rules, Memorandum Opinion and Order on Reconsideration,* 12 F.C.C.R. 9972, ¶¶ 125–32 (1997) [Reconsideration Order].

In June, 1997 the Commission adopted a similar set of rules for the lower 230 channels. Again, the agency decided to auction off new EA licenses, each of which would cover a wide geographic area and a large block of spectrum. It did not, however, grant EA licensees in the lower 230 channels the right involuntarily to displace incumbents. As before, the Commission chose to aid small businesses at the auction with bidding credits, but this time deferred deciding whether to stop accepting installment payments. *See Amendment of Part 90 of the Commission's Rules, Second Report and Order,* 12 F.C.C.R. 19079, ¶¶ 276–80 (1997) [Second Report and Order].

In October, 1997, after this Court denied SMR WON's motion for a stay, the Commission conducted an auction for EA licenses in the upper 200 channels. Nextel purchased 475 of the 525 licenses and 33,640 of the 35,000 channels offered. *See Public Notice,* 12 F.C.C.R. 20417 (1997). The Commission has not yet scheduled an auction for EA licenses in the lower 230 channels.

## II. Analysis

■ Insofar as the petitioners challenge the Commission's view of the authority delegated to it by statute, this court's review is governed by *Chevron, U.S.A., Inc. v. NRDC,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). We must first determine whether the Congress, in the Communications Act as amended, unambiguously addressed the "precise question[s] at issue" here. 467 U.S. at 842, 104 S.Ct. 2778. If it did not, then the agency's interpretation, assuming it is reasonable, must prevail. *See id.* at 844, 104 S.Ct. 2778. Insofar as the petitioners attack the Commission's exercise of its statutory authority, this court's review is limited to determining whether the agency's decisions were arbitrary and capricious within the meaning of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). *See Arent v. Shalala,* 70 F.3d 610, 616 (D.C.Cir.1995). The agency has met this standard if it "examined the relevant data and articulated a satisfactory explanation for its action." *Atlantic Tele–Network, Inc. v. FCC,* 59 F.3d 1384, 1389 (D.C.Cir.1995).

### A. "Interim Coverage Requirement" Limited to EA Licensees

■ The Commission allows cellular, PCS, and EA licensees to provide service after three years to as little as one-third, and after five years to as little as two-thirds, of the population in the areas covered by their licenses. Southern contends that the Commission construed the Act unreasonably and acted arbitrarily when it refused to extend this rule to incumbent wide-area SMR licensees such as itself, that is, those that have "obtained extended implementation authorizations . . . and who offer real-time, two-way voice service that is interconnected with the public switched network." According to Southern, which is "seeking authorization to construct hundreds of [additional] sites throughout its licensed geographical area," it occupies a position in the market indistinguishable from that of any wide-area licensee—offering services over a large geographic area, competing directly with EA licensee Nextel as well as with cellular and PCS

licensees, and using the same technology as do they. Because Southern was licensed under the *ancien regime* for SMR licensees, however, it is required to provide service to everyone in its license area within two years of licensing. Southern challenges the Commission to reconcile this disparate treatment with its statutory mandate to impose "comparable" requirements upon "providers of substantially similar ... services." Pub.L. No. 103–66, § 6002(d)(3)(B), 107 Stat. 312 (1993).

Faced with this argument on reconsideration, the Commission defended its decision upon two grounds:

> ■ We impose a two year build out period on [incumbent] site licensees because, by definition, they are seeking authority to build out and operate a particular site. EA licensees, in contrast, will be building multiple sites throughout their licenses' entire geographical area and thus require a longer build out period. [2] Moreover, the competitive bidding process provides incentives for EA licenses to build out quickly, and thus reduces the likelihood that a longer construction period would lead to spectrum warehousing.

Reconsideration Order at ¶ 81.

Neither explanation bears scrutiny. The Commission elevates form over function when it applies the first reason to an incumbent site licensee providing radio telephone service over a wide area; because it is licensed for a multitude of "particular site[s]," it too "will be building sites throughout ... [an] entire geographic area and thus require a longer build out period." Moreover, the Commission ignores a key difference in the regulatory regimes it has imposed upon two "substantially similar ... services": An EA licensee will never have to provide service to more than two-thirds of its market, while a wide-area incumbent offering the same service will be required to cover its entire service area within two years. Even if the obstacles an EA licensee faces in constructing its system warrant giving it more time than is allowed to a comparable SMR licensee, the Commission has not explained why the EA licensee should have a permanent advantage over incumbent SMR licensees— namely, not having ever to serve the unprof-

itable precincts within its licensed service area.

The Commission's second rationale proceeds from the premise that because an incumbent SMR licensee, unlike an EA licensee, did not have to expend a substantial sum to get its license, the incumbent has less incentive, in order to recoup its investment, to put its spectrum into service quickly. In the Commission's terms, the incumbent is more likely to "warehouse" its spectrum because it received its license free. This is a foolish notion that should not be entertained by anyone who has had even a single undergraduate course in economics. *See* Armen A. Alchian & William R. Allen, Exchange & Production 222 (3rd ed.1983) ("[O]nce [an item] is acquired, [its cost is] irrelevant to any future decision."); James D. Gwartney & Richard L. Stroup, Economics 417–19 (4th ed.1982) ("If they are to minimize costs, business decision-makers must recognize the irrelevance of sunk costs."); N. Gregory Mankiw, Principles of Economics 291 (1997) ("The irrelevance of sunk costs explains how real businesses make decisions."); Paul A. Samuelson & William D. Nordhaus, Economics 167 (16th ed.1998) ("One of the most important lessons of economics is that you should look at the marginal costs and marginal benefits of decisions and ignore past or sunk costs"). Failing that advantage, a moment's reflection would bring one to the realization that the use to which an asset is put is based not upon the historical price paid for it, but upon what it will return to its owner in the future. Would anyone be less interested in earning a return on money he had inherited than on money he had worked for? Of course not! Are radio licensees not as alert as inheritors? Whether a license costs millions of dollars or nothing, that is, absent some institutional constraint imposed upon EA licensees by the Commission, or lenders, for example—and the agency alludes to none—a rational licensee will voluntarily put its spectrum into service only when the additional revenue it expects to earn from doing so exceeds the additional cost it must incur to do so. Therefore, the Commission cannot reasonably assert that EA licensees will be any less prone

than their incumbent SMR competitors to warehouse spectrum.

Because the Commission has failed to articulate a satisfactory explanation for its refusal to extend the Interim Coverage Requirement to wide-area SMR licensees, we hold that its decision was arbitrary and capricious in that respect. *See Atlantic Tele-Network, Inc.*, 59 F.3d at 1389. We shall not go on, however, to address the question whether the agency's interpretation of the statute to allow such a distinction is permissible under *Chevron*: The Commission did not think seriously about the question whether wide-area incumbent SMR licensees are in fact sufficiently different from EA, cellular, and PCS licensees that disparate regulatory treatment is warranted under § 6002(d)(3)(B). We are therefore reluctant to render what may be an uninformed application of the statute to the facts about these various services. Accordingly, we shall remand this matter for the agency to reconsider in the first instance. In the interim, the Commission shall not deny Southern the benefit of the Interim Coverage Requirement.

## B. Authority to Auction EA Licenses

■ Fresno and SMR WON (hereinafter collectively referred to as "Fresno") question the Commission's authority under § 309(j)(1) to auction EA licenses in the upper 200 channels. That section provides that if "mutually exclusive applications are accepted for any initial license ... then ... the Commission shall grant the license ... through a system of competitive bidding." 47 U.S.C. § 309(j)(1). Fresno maintains that the "common sense" meaning of an "initial license" is a license for a new radio service, for an existing service in a newly served area, or for previously unused spectrum. It points out that many of the auctioned channels were already licensed to SMR providers, and that at least some of those incumbent licensees offer the same interconnected services as will the EA licensee that prevailed in the auction. At least to that extent, according to Fresno, no new service is being licensed, hence, no "initial" license is involved. In response, the Commission contends the EA licenses it auctioned off are indeed "initial" because they are "first-time licenses for [EA] systems and not renewals or modifications of existing licenses."

The statute does not unambiguously resolve "the precise question at issue" here, *Chevron*, 467 U.S. at 842, 104 S.Ct. 2778— whether the Commission's creation of a new "licensing scheme" gives it the authority to grant by auction a license for spectrum currently being used by a licensee to provide substantially the same (in this case, interconnected) service. To be "initial" in any meaningful sense, a newly issued license must differ in some significant way from the license it displaces; upon that the parties agree. According to Fresno, the difference must be that the new license covers a new service or territory or is for previously unused spectrum. Although a plausible interpretation of the term, this is not the only plausible one: As the Commission suggests, nothing in the text of the statute forecloses it from considering a license "initial" if it is the first awarded for a particular frequency under a new licensing scheme, that is, one involving a different set of rights and obligations for the licensee. Even if such a license authorizes no new service and covers spectrum already in use, it is the first license for that spectrum issued under the new regulatory regime. Because the critical term of the statute is therefore ambiguous, we turn to *Chevron* step two and the question whether the Commission's resolution of that ambiguity is reasonable.

Fresno contends that the Commission's interpretation of "initial license" is unreasonable, because it removes all limitations upon the agency's authority to allocate licenses by auction. That, however, is simply not true: The Commission acknowledges that it must have instituted a new regulatory regime for a new license to be deemed "initial" and thus subject to competitive bidding. Here the Commission has, as it says, "revis[ed] its frequency allocations and its licensing scheme." Fresno insists that the Commission has not created a genuinely new regulatory scheme, but that is incorrect, too. As noted above, EA licenses cover blocks of spectrum and substantial geographic areas, while the previously issued SMR licenses are

for small groups of channels and individual transmitters. Unlike incumbents, moreover, EA licensees enjoy both the liberalized build out rule and the power involuntarily to relocate other licensees. True it is, as Fresno points out, that the Commission experimented with some of these changes in the early 1990s by waiving its prior rules in particular SMR license proceedings. *See, e.g., Fleet-Call,* 6 F.C.C.R. 1533, ¶ 21 (1991) (waiving build-out rule). That may show that the development of the Commission's thinking was evolutionary rather than revolutionary; it does not, however, mean that the EA licensing regime is merely old wine in a new vessel. In sum, because an EA license is substantially different from an SMR license, the agency did not act unreasonably in treating EA licenses as "initial license[s]" within the meaning of § 309(j)(1).

## C. Elimination of Installment Payment Plans

■ Fresno next challenges the Commission's decision to stop letting small businesses pay by installment for licenses in the upper 200 channels purchased at auction. Fresno contends that the prior practice is required by § 309(j)(3)(B), which says that, in designing an auction, the agency should seek to disseminate licenses "among a wide variety of applicants, including small businesses." Fresno characterizes the agency's substitute policy of providing bidding credits for small businesses as a "token gesture," the insignificance of which it says is demonstrated by Nextel having bought the great majority of the licenses offered.

■ There are two problems with Fresno's position. First, § 309(j)(3)(B) requires the agency to consider a variety of objectives—not only the promotion of small businesses but also, among others, "the development and rapid deployment of new technologies, products, and services," "the avoidance of unjust enrichment," and the "efficient and intensive use of the electromagnetic spectrum." 47 U.S.C. § 309(j)(3). When an agency must balance a number of potentially conflicting objectives, which these are, judicial review is limited to determining whether the agency's decision reasonably advances at least one of those objectives and its decisionmaking process was regular. *See Melcher v. FCC,* 134 F.3d 1143, 1154 (D.C.Cir.1998). Here, the record demonstrates, the Commission decided to eliminate the installment payment plan after thoroughly considering the competing statutory objectives. Having recently encountered severe problems created by licensees defaulting on their installment payments, the Commission reasonably decided to reevaluate its payment policy. Because that would take some time, and because several years had already passed since the agency had accepted any new applications for 800 MHz SMR licenses, it concluded that a system of bidding credits would strike the best balance between solicitude for small businesses and prompt and effective use of the spectrum. *See* Reconsideration Order at ¶¶ 130–32. Its decision, therefore, clearly meets the *Melcher* standard.

■ Second, the Commission did not simply sacrifice the goal of promoting small businesses in favor of other statutory objectives; rather, it chose one method of achieving that goal over another. While it is true, as Fresno emphasizes, that the method chosen did not turn out to be successful at allocating licenses "among a wide variety of applicants," an agency's predictive judgment regarding a matter within its sphere of expertise is entitled to "particularly deferential" review. *Milk Indus. Found. v. Glickman,* 132 F.3d 1467, 1478 (D.C.Cir.1998). Fresno makes no showing that the Commission's decision was unreasonable *ex ante*; rather, its argument is that the Commission's belief in the efficacy of bidding credits appears *ex post* to have been mistaken. Because this argument is not a challenge to the reasonableness of the agency's decision on the basis of the record then before it, Fresno's claim must fail.*

---

\* Fresno also contends that the agency failed to consider the interests of businesses owned by women and members of minority groups, as is also required by § 309(j)(3)(B). Because Fresno makes no showing, however, that any of its members is owned by a woman or a member of a

### D. "Modification" of Incumbent Licensee Rights

 Finally, Fresno contends that the licenses of incumbent SMR providers in the upper 200 channels will be "modified" to the extent they are forced to relocate to the lower 230 channels, and that § 316 of the Act therefore required the agency to grant each incumbent an evidentiary hearing before awarding a mutually exclusive EA license. *See* 47 U.S.C. § 316(a)(1) (no "order of modification shall become final until the holder of the license ... [has been] given reasonable opportunity ... to protest"). We do not address the merits of this argument, however, because Fresno failed to raise it before the Commission. *See* 47 U.S.C. § 405(a) ("filing of a petition for reconsideration [is] ... a condition precedent to judicial review ... where the party seeking such review ... relies on questions of fact or law upon which the Commission ... has been afforded no opportunity to pass"). A number of parties did complain to the Commission that the agency's proposed EA licensing rules were, for a variety of reasons, unfair to incumbents, but none of their objections mentioned § 316 even in passing, nor did any party request an evidentiary hearing. Hence, we cannot say that the Commission was given a reasonable "opportunity to pass" upon the argument Fresno now makes. *See Bartholdi Cable Co. v. FCC*, 114 F.3d 274, 279 (D.C.Cir. 1997).

### III. Summary and Conclusion

First, the Commission failed reasonably to explain its decision to apply different build out requirements to EA licensees and to incumbent wide-area SMR licensees, such as Southern, which provide substantially similar services. Accordingly, the Interim Coverage Requirement for EA licensees must be remanded to the agency for further consideration in conformity with Public Law 103–66.

Second, the Commission reasonably concluded that it had the statutory authority to grant EA licenses by competitive bidding and that the auction rules it chose would advance the interests of small business bidders. We do not consider Fresno's claim to an evidentiary hearing under § 316 because it was not raised before the agency. We have considered and rejected the petitioners' other arguments, which do not merit treatment in a published opinion.

*Judgment Accordingly.*

---

minority group, it lacks standing to raise this argument. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61 and n. 1, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (to have standing, plain-

tiff must have suffered a "particularized" injury, meaning that "the injury must affect the plaintiff in a personal and individual way").