**Daniel R. GOODMAN, Solely in his Capacity as Receiver, Chadmoore Wireless Group, Inc., and SMR Services, Inc., et al., Petitioners,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents.**

Nos. 95–1585, 98–1373, 98–1488 to 98–1490.

United States Court of Appeals, District of Columbia Circuit.

Argued May 4, 1999.

Decided July 16, 1999.

Rodney H. Glover argued the cause for petitioner SMR Services, Inc., et al. Martin Lobel argued the cause for petitioner Chadmoore Wireless Group, Inc. With them on the joint briefs were Russell H. Fox, Laura C. Mow, Laurie A. Holmes, Henry M. Banta and Lee E. Helfrich.

Roberta I. Cook, Counsel, Federal Communications Commission, argued the cause for respondents. With her on the brief were Joel I. Klein, Assistant Attorney General, U.S. Department of Justice, Robert B. Nicholson and Adam D. Hirsh, Attorneys, Christopher J. Wright, General Counsel, Federal Communications Commission, and Daniel M. Armstrong, Associate General Counsel. C. Grey Pash, Jr., Counsel, entered an appearance.

Before: GINSBURG, SENTELLE and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

More than 4,000 individuals obtained licenses in the Specialized Mobile Radio (SMR) service apparently without realizing that the Federal Communication Commission's "build out" rules require a licensee to construct and to begin operating a transmission facility within a specified period. The Commission extended the build out deadlines for an imprecisely specified group of the licensees, membership in which it later construed narrowly. The

petitioners contend the later decision was arbitrary and capricious. We do not reach the merits of the petitioners' claim because the only one among them who sought review in time lacks standing to challenge the Commission's decision.

## I.  Background

The commercial potential of an SMR license has grown dramatically in recent years. Previously used primarily for small-scale dispatch operations, SMR licenses have increasingly been used to provide cellular and data transmission services over a wide area. *See Fresno Mobile Radio, Inc. v. FCC,* 165 F.3d 965, 967 (D.C.Cir.1999). Seeking to capitalize upon this development, a number of companies began in the early 1990s to tout SMR licenses as investment opportunities for individuals. For a substantial fee (typically around $7,000) such promoters would prepare an SMR license application for an individual, who hoped to sell the license for a profit shortly after receiving it.

These so-called "application mills" neglected to tell their customers that under the Commission's then-applicable rules a license would lapse if the licensee failed within eight months to build and to start operating a transmission system. Even a licensee who successfully started operating, moreover, would lose the right to exclusive use of any broadcasting channel not "loaded to" (i.e., in use by) 70 mobile units within the same eight month period. Few if any of the individuals who obtained SMR licenses with the help of an application mill intended to build transmission facilities or were even capable of doing so. Nor could they sell their licenses as planned because the Commission forbids the sale of a license before its holder satisfied the construction requirement. Consequently, many of the application mills' customers lost their licenses and others were in jeopardy of losing them.

In January 1994 the Federal Trade Commission sued four application mills for fraud. *See FTC v. Metropolitan Commu-* *nications Corp.,* No. 93 CIV 0142 (S.D.N.Y. filed Jan. 11, 1994). Three days later, the district court placed the defendant companies in receivership and appointed Daniel Goodman the Receiver. In March 1994 Goodman petitioned the FCC temporarily to waive its build out rules in order to give the licensees who used the services of the companies in receivership an additional eight months in which to construct and load their systems. The Commission instead granted those "receivership licensees" an additional four months for construction. *See Memorandum Opinion and Order,* 10 F.C.C.R. 8537, ¶¶ 14–28 (1995) [Extension Order].

Even before the Extension Order could be published in the Federal Register and thereby take effect, Goodman sought a court order concerning its scope and proper implementation. He complained that Commission staff, apparently being of the view that the Order extended only the time for construction and not the time for loading channels to mobile units, continued to strip receivership licensees of their right to exclusive use of channels after only eight months. He also took the position that receivership licensees who had voluntarily canceled their licenses were entitled to the benefit of an extended build out period. The Commission agreed to delay the effective date of the Order while it discussed these issues with Goodman.

After more than two years of fruitless negotiations, the Commission unilaterally resolved all the outstanding issues. *See Memorandum ˑOpinion and Order and Order on Reconsideration,* F.C.C. 98–167 (1998) [Implementation Order]. The agency first concluded that because Goodman represented only the application mills and not their customers, he did not have standing on behalf of the receivership licensees to challenge the agency's decisions. *See id.* at ¶¶ 28–34 (applying 47 C.F.R. § 1.106). Nevertheless, the Commission on its own motion addressed and rejected Goodman's substantive arguments. The agency then turned to the question wheth-

er licensees defrauded by application mills other than the four the FTC had sued (the so-called "similarly situated" licensees) should have the benefit of the four month enlargement of the construction period granted to the receivership licensees in the Extension Order. It determined that they should—provided they had filed a request for an extension before the expiration of their original eight month deadline. *See id.* at ¶¶ 59–60. In contrast, the agency gave the receivership licensees the extension regardless whether they had applied for it before the expiration of their original deadlines.

Goodman petitioned for review of the Implementation Order in August 1998, arguing that the Commission had arbitrarily and capriciously refused to revive the licenses that had been voluntarily canceled and to extend the receivership licensees' deadlines for loading. On October 9 of that year the agency released a list of licensees it considered similarly situated to the receivership licensees within the meaning of the Implementation Order. On October 26 Chadmoore Wireless Group, Inc., a holder of numerous similarly situated licenses; SMR Services, Inc., a license broker; and 22 individuals holding similarly situated licenses (collectively the Licensee Petitioners) petitioned for review of the Implementation Order, arguing that it gives the receivership licensees preferential treatment and that the agency unlawfully failed to give them prior notice that the Order would affect their interests.

## II. Analysis

The Commission claims that none of the petitions for review is properly before us. Goodman, it says, lacks standing, and the Licensee Petitioners failed to seek review in the time allowed. We find merit in both arguments.

### A. The Standing of the Receiver

■ According to the Commission, Goodman lacks standing because the application mills of which he is Receiver were not themselves affected by the agency decisions at issue. Because Goodman sues solely in his capacity as Receiver, we first address the significance of that status.

Goodman suggests that a receiver has the power to sue on behalf of customers and creditors of the entity in receivership even when the entity itself would not have standing to do so. The sole case upon which he relies, however, does not support his position. The plaintiff in *Scholes v. Lehmann,* 56 F.3d 750 (7th Cir.1995), was the receiver of a corporation (actually, more than one) that had made allegedly fraudulent conveyances at the direction of its controlling shareholder. When the receiver sued to set aside the transfers, the transferees challenged his standing. The corporation in receivership, they said, had no interest in reversing a series of fraudulent transactions in which it was complicit; hence, the receiver was really suing on behalf of the company's innocent creditors, which exceeded his authority to look out for the interests of the corporation itself. *See id.* at 753–54.

■ The Seventh Circuit disagreed. The conveyances, it reasoned, had injured the corporation by diverting its assets to an unauthorized use. To be sure, the company could not be heard to complain about the conveyances while it remained under the control of the shareholder responsible for them. Once he was out of the picture, however, the company regained its right to the property fraudulently conveyed "for the benefit not of [the controlling shareholder] but of innocent investors." *Id.* at 754. Because the suit was therefore one the corporation itself could have brought, the receiver was authorized to sue on its behalf. *See id.* at 754–55. As this summary attests, nothing in *Scholes* supports Goodman's expansive view of a receiver's authority to sue on behalf of the customers and creditors of the company he represents; in fact, the decision is a straightforward application of the rule that a receiver has authority to bring a suit only if the entity in receivership could itself properly

have brought the same action. *See Caplin v. Marine Midland Grace Trust Co.,* 406 U.S. 416, 429, 92 S.Ct. 1678, 32 L.Ed.2d 195 (1972); *Jarrett v. Kassel,* 972 F.2d 1415, 1426 (6th Cir.1992); *Fleming v. Lind–Waldock & Co.,* 922 F.2d 20, 25 (1st Cir.1990).

■ Turning, therefore, to the critical question, we conclude the application mills would not have standing to bring this action on their own account. A plaintiff must, in the ordinary case, "assert [its] own legal interests, rather than those of third parties." *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 100, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979). As the Commission contends, Goodman's petition for review on behalf of the application mills runs afoul of this rule, for it is premised upon the Commission's alleged maltreatment not of the application mills but of the receivership licensees.

■ Goodman's response, in effect, is to claim that he has third-party standing to assert the rights of the receivership licensees because their interests and those of the application mills are, for the purposes of this action, congruent. He has contracted with a telecommunications company that will buy a large number of the receivership licenses, contingent upon the Commission first granting the receivership licensees a four month extension of the loading deadline which, as noted above, the agency has refused to do. (The Commission has, however, agreed to waive its rule barring the sale of "unconstructed" licenses in order to make some of these transactions possible. *See* Implementation Order at ¶¶ 54–58). Any sales that occur will also benefit the application mills by reducing the damages for which they will be liable if the receivership licensees successfully sue them for fraud.

■ A mere congruence of interests between the receivership licensees and the application mills in whose place Goodman stands does not suffice to make Goodman a proper party to vindicate the interests of the receivership licensees. A plaintiff may assert the rights of a third party only when there is "some hindrance to the third party's ability to protect his or her own interests," *Powers v. Ohio,* 499 U.S. 400, 411, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991); *see also United States House of Representatives v. United States Dept. of Commerce,* 11 F.Supp.2d 76, 88 (D.D.C. 1998), *aff'd,* —— U.S. ——, 119 S.Ct. 765, 142 L.Ed.2d 797 (1999), but Goodman does not suggest any reason for thinking the receivership licensees are unable to sue the Commission themselves. It is true, as he suggests, that having all the receivership licensees' claims litigated in one suit would be considerably more convenient than hearing each one separately. We do not see, however, why a class action would be inadequate to that task. *Cf. Fair Employment Council of Greater Washington, Inc. v. BMC Marketing Corp.,* 28 F.3d 1268, 1280 (D.C.Cir.1994) (civil rights organization did not have standing to raise claims of individual victims of discrimination; although not always aware that they had been discriminated against, those individuals did not face "serious" barrier to suit on their own behalf).

We conclude that Goodman lacks standing to sue the Commission. He does not represent the parties who sustained the injury of which he complains, nor is there anything preventing the parties who were injured from themselves protecting their rights.

B. The Timeliness of the Licensee Petitions

The Commission next questions our jurisdiction to consider the claims of the Licensee Petitioners, none of whom, the agency argues, timely sought judicial review. A party aggrieved by an agency order has 60 days from the "entry" thereof in which to file a petition for review. 28 U.S.C. § 2344. Pursuant to a regulation of the Commission, an order (or other document) is entered when the agency gives "public notice" thereof. 47 C.F.R.

§ 1.4(b). When public notice occurs depends, in turn, upon the nature of the proceeding that gave rise to the order. The Commission deems the public notified of an order "in [a] notice and comment rule making proceeding[ ]" and in a "rule making[ ] of particular applicability" when it is published in the Federal Register. *Id.* at § 1.4(b)(1), (3). For a "non-rulemaking" order, in contrast, notification occurs when the full text of the order becomes "available to the press and public in the Commission's Office of Public Affairs." *Id.* at § 1.4(b)(2).

The Commission characterizes the Implementation Order as a "non-rulemaking document" on the ground that it was issued in the course of an adjudicatory proceeding, namely Goodman's request for a temporary waiver of the build out rules. The Order was made available in the Office of Public Affairs on July 31, 1998; therefore, the Commission concludes, the 60 day period for review expired on September 29, 1998, almost a month before the Licensee Petitioners sought review in this court.

■ According to the Licensee Petitioners, this reasoning is flawed in two respects. First, they say that even if the Implementation Order is a non-rulemaking order, the Commission failed to provide meaningful "public notice" of its decision until October 9, when it released the list of those licensees it regarded as being situated similarly to the receivership licensees. This argument unjustifiably assumes that a reasonably acute licensee, upon reading the Implementation Order, would not have been able to determine whether his interests were affected. Anyone who obtained his license with the help of an application mill, however, should have realized that he was, or at least might be, affected by the Implementation Order. *See* Implementation Order at 9 n.50 ("individuals who obtained their licenses through SMR application preparation companies similar to the Receivership Companies" qualify as similarly situated licensees). Although the Implementation Order is not a model of clarity in every respect, there is nothing mysterious about the identity of the licensees to which it applies. Nor can the order be deemed unclear even if, as the Licensee Petitioners allege, the Commission's October 9 list of licensees in the "similarly situated" category omits some who qualify under the criterion in the Implementation Order. That the agency may have applied the Order erroneously does not retroactively import ambiguity into the Order itself.

■ The Licensee Petitioners next argue that the proceeding in question looked sufficiently like a rulemaking, as opposed to an adjudication, that the Implementation Order should not be deemed a "non-rulemaking" order. In this vein they point out that the Commission sought public comment before reaching its decision, as it is required to do in a rulemaking but not in an adjudication, and published the Implementation Order in the Federal Register under the heading "Final Rules." The Order itself, moreover, is rule-like in that it affects the interests of a broad class of licensees. Most striking of all, the Licensee Petitioners argue, although they were not parties to the proceeding and did not have adequate notice of it, the Order determines the validity of many of their licenses. Accordingly, they say, the Order was issued in either a "notice and comment rule making proceeding[ ]" or in a "rule making[ ] of particular applicability." *Id.* at § 1.4(b)(1), (3). In either case the period for seeking review did not begin to run until August 27, 1998, when the Order was published in the Federal Register, making their October 26 petitions for review timely. At the very least, they argue, the Commission's failure to make clear whether the proceeding was a rulemaking or an adjudication should not now serve to insulate its decision from judicial review.

We think the Commission's characterization of the Implementation Order as a "non-rulemaking" order is proper. For one thing, Goodman never sought a change

in the agency's build out rules; he consistently identified his request as one for a "temporary waiver" of those rules. That is a strong reason to conclude the proceeding was not a rulemaking, which is defined in the Administrative Procedure Act as an "agency process for formulating, amending, or repealing a rule." 5 U.S.C. § 551(5). Also like an adjudicatory decision, and unlike a rule, the Implementation Order was retrospective in that it extended the build out deadline applicable to licenses that had already been issued. A rule, in contrast, is defined in the APA as an "agency statement of . . . future effect." *Id.* at § 551(4); *see also Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 216–17, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) ("central distinction" between rulemaking and adjudication is that rules have legal consequences "only for the future.") (Scalia, J., concurring). The manner in which the Commission conducted the proceeding revealed its adjudicatory nature as well. Recall that the agency determined Goodman lacked standing pursuant to 47 C.F.R. § 1.106. *See* Extension Order at ¶¶ 28–34. Had the proceeding been a rulemaking, the agency's extensive discussion of the standing issue would have been inexplicable: Section 1.106 expressly provides that it "does not govern" in "notice and comment rulemaking proceedings." *See also* 1 Kenneth Culp Davis & Richard J. Pierce, Jr., *Administrative Law Treatise,* § 6.7, 266 (3rd ed.1994) (agency rulemaking proceedings typically open to any interested member of the public).

▪ Such aspects of the proceeding as gave it any semblance of a rulemaking were, we think, comparatively superficial. That the Implementation Order appeared under the heading "Final Rules" may reveal something about the care taken in writing headings when documents are published in the Federal Register but does not alter the clearly adjudicatory nature of the Order itself. *Cf. Brotherhood of R.R. Trainmen v. Baltimore & Ohio R.R. Co.,* 331 U.S. 519, 528–29, 67 S.Ct. 1387, 91 L.Ed. 1646 (1947) (headings of sections in U.S.Code can resolve, but not create, am-

biguity in text). The Commission's solicitation of public comment before deciding whether to grant the waiver Goodman was seeking is still less probative for, as the petitioners concede, the agency may seek comment in either a rulemaking or an adjudicatory proceeding. In fact, we have gone so far as to suggest that notice and comment is sometimes required in an adjudication. *See Independent U.S. Tanker Owners Comm. v. Lewis,* 690 F.2d 908, 922–23 (1982) ("The distinct and steady trend of the courts has been to demand in informal adjudications procedures similar to those already required in informal rulemaking. . . . [namely,] notice, comment, and a statement of reasons"). Neither does the petitioners' observation that the Implementation Order affected a large number of licensees carry much weight: Just as a class action can encompass the claims of a large group of plaintiffs without thereby becoming a legislative proceeding, an adjudication can affect a large group of individuals without becoming a rulemaking. *See NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 292, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974) (agency may in an adjudication "promulgate a new standard that would govern future conduct" of non-parties).

As for the petitioners' complaint that the Implementation Order affected the rights of licensees who were not parties to the proceeding—and it would be more accurate to say that the Order gave relief to some licensees who had not appeared before the agency to ask for it—the nature of adjudication is that similarly situated nonparties may be affected by the policy or precedent applied, or even merely announced in dicta, to those before the tribunal. *See NLRB v. Wyman–Gordon Co.,* 394 U.S. 759, 765–66, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969) ("Adjudicated cases may . . . serve as vehicles for the formulation of agency policies, which are applied and announced therein. They generally provide a guide to action that the agency may be expected to take in future cases"). Even assuming that the proceeding was somehow an imperfect exemplar of adjudication, however, it was not thereby trans-

formed into a rulemaking. Particularly in view of the deference we afford an agency's interpretation of its own regulations, *see Associated Builders & Contractors, Inc. v. Herman,* 166 F.3d 1248, 1254 (1999), we think the Commission's decision to treat the Implementation Order as a "non-rulemaking document" within the meaning of § 1.4(b)(2) was justified.

■■■ Falling back to their last line of defense, the petitioners protest that it is not enough for the Commission's interpretation of § 1.4(b)(2) to be reasonable *ex post*; if it is to cut off a party's right to seek judicial review, then the agency must have made its characterization of the Implementation Order reasonably apparent *ex ante.* We agree with this statement of the law. *See Adams Telcom, Inc. v. FCC,* 997 F.2d 955, 956–57 (D.C.Cir.1993) (although petition would have been untimely under agency's reasonable conclusion that order at issue was "non-rulemaking document," court had jurisdiction because petitioner reasonably believed that longer limitation period provided by § 1.4(b)(1) would apply). We disagree, however, that in this instance the agency failed to make the nature of the proceeding sufficiently manifest.

A comparison with *Adams,* the case upon which the petitioners principally rely, is instructive. The Commission there had denied an application for a "pioneer's preference" in obtaining licenses. The agency moved to dismiss the applicants' petition for review as untimely, claiming that its order denying the application was a "non-rulemaking document" under § 1.4(b)(2). The applicants, pointing out that the Commission released the order in the course of what it conceded was a rulemaking, argued that the order was actually a "document[ ] in ... [a] rule making proceeding[ ]" under § 1.4(b)(1), and therefore that they had sought review in time. The court acknowledged that the Commission's interpretation of § 1.4(b)(2) was reasonable. Because the applicants' reading was equally reasonable, however, and because the proper classification of the order would not

have been clear to them "even upon [a] careful reading of the Commission's regulations," *id.* at 957, the court refused to bind the applicants to the agency's interpretation.

Here, as we have discussed, a reasonably careful reader of the Implementation Order and the Commission's regulations would have readily discerned the adjudicatory nature of the proceeding. Although bearing some superficial resemblance to a rule, the Implementation Order addressed a proposal made on behalf of certain licensees only for a temporary, remedial waiver of the agency's build out rules—not for their general, prospective amendment. Furthermore, in the Order the agency applied a regulation on standing that by its terms applies only in an adjudication. Unlike the complaining licensees in *Adams,* therefore, the petitioners here had no reasonable expectation that they would enjoy the longer period for review provided by §§ 1.4(b)(1) or (3).

### III. Conclusion

For the foregoing reasons, the petitions for review are

*Dismissed.*