# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued April 1, 2016                    Decided May 24, 2016

No. 15-1064

GREAT LAKES COMNET, INC. AND WESTPHALIA TELEPHONE
COMPANY,
PETITIONERS

v.

FEDERAL COMMUNICATIONS COMMISSION AND UNITED
STATES OF AMERICA,
RESPONDENTS

AT&T SERVICES, INC., ET AL.,
INTERVENORS

———

On Petition for Review of an Order of
the Federal Communications Commission

———

*Michael G. Oliva* argued the cause for petitioners. With him on the joint briefs was *Philip J. Macres.*

*Russell M. Blau* was on the brief for *amicus curiae* The National Telecommunications Cooperative Association d/b/a NTCA-The Rural Broadband Association in support of petitioners.

*Thaila K. Sundaresan*, Counsel, Federal Communications Commission, argued the cause for respondents. With her on

the brief were *William J. Baer*, Assistant Attorney General, U.S. Department of Justice, *Robert B. Nicholson* and *Daniel E. Haar*, Attorneys, *Jonathan B. Sallet*, General Counsel, Federal Communications Commission, *David Gossett*, Deputy General Counsel, *Jacob M. Lewis*, Associate General Counsel, and *Richard K. Welch*, Deputy Associate General Counsel. *Sarah E. Citrin*, Attorney, Federal Communications Commission, entered an appearance.

*Michael J. Hunseder* argued the cause for intervenors. With him on the brief were *Paul Zidlicky*, *Gary L. Phillips*, *David L. Lawson*, *Charles McKee*, *Christopher M. Miller*, and *John E. Benedict*.

Before: TATEL, SRINIVASAN, and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: Great Lakes Comnet, Inc. petitions for review of a Federal Communications Commission order finding that the rates it charged long-distance telephone carrier AT&T for use of its network exceeded the amount allowed by Commission regulations. Because the Commission failed to adequately explain its conclusion that Great Lakes did not qualify for the Commission's "rural exemption," which would have allowed it to charge the challenged rates, we remand that issue to the Commission for further consideration. In all other respects, we deny the petition for review.

## I.

When customers, known as end users, buy telephone service, they generally contract with two different entities: a local telephone company, known as a local exchange carrier

or LEC, and a long-distance carrier. The LEC owns the phone lines that connect directly to end users, and it is through the LEC's lines that users make local calls. The long-distance carrier connects end users' LEC networks to other LEC networks around the country, thus giving end users the ability to make long-distance calls. *See generally Northern Valley Communications, LLC v. FCC*, 717 F.3d 1017, 1018 (D.C. Cir. 2013) (describing the roles of local exchange carriers and long-distance carriers in the telephone market). As an example, when a mother calls her son on the other side of the country, the call travels from her LEC's lines to her long-distance carrier's lines and then from those lines to the son's LEC's lines, across which it travels to the son's phone. The calling party, here the mother, pays her long-distance carrier for the call, and the long-distance carrier then pays access fees to the mother's LEC and the son's LEC. *See generally* In re Access Charge Reform ("Seventh Report and Order"), 16 FCC Rcd. 9923, 9926–27 ¶ 10 (2001) (explaining that customers pay their long-distance carriers for calls and that those carriers then pay access fees to the caller's LEC and the recipient's LEC).

Prior to the Telecommunications Act of 1996, a single LEC provided local exchange service for a given region pursuant to a monopoly franchise granted by the state. *See AT&T Corp. v. Iowa Utilities Board*, 525 U.S. 366, 371 (1999) ("Until [the Telecommunications Act] . . . [s]tates typically granted an exclusive franchise in each local service area to a local exchange carrier . . . ."). These carriers—"Bell Operating companies and their successors"—are now called incumbent local exchange carriers or ILECs. *Competitive Telecommunications Ass'n v. FCC*, 309 F.3d 8, 10 (D.C. Cir. 2002). Seeking to increase competition, the Act required that states allow other carriers, known as competitive local exchange carriers or CLECs, to enter the local exchange

market. 47 U.S.C. § 253(a) ("No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service."). To promote CLEC entry, Congress required that ILECs make their networks available to CLECs "on rates, terms, and conditions that are just, reasonable, and nondiscriminatory." *Id.* § 251(c)(3) ("An [ILEC] shall provide . . . unbundled network elements in a manner that allows requesting carriers to combine such elements in order to provide such telecommunications service.").

At first, the Federal Communications Commission left CLEC access rates unregulated. But after discovering that CLEC rates generally exceeded ILEC rates, the Commission changed course and subjected CLECs to rate regulation. *See* Seventh Report and Order, 16 FCC Rcd. at 9931 ¶¶ 21–22 (explaining that prior to the order "CLECs ha[d] been largely unregulated in the manner that they set their access rates" but that the Commission's review revealed that "CLEC access rates . . . , on the average, are well above the rates that ILECs charge for similar service"). Under the Commission's regulations, known as benchmark rate regulations, a CLEC's tariffed access rates may not exceed the rates of the ILEC that would otherwise serve the CLEC's customers. 47 C.F.R. § 61.26(b) ("[A] CLEC shall not file a tariff for its interstate switched exchange access services that prices those services above . . . [t]he rate charged for such services by the competing ILEC."). The regulations do not apply, however, to "rural CLEC[s]," *id.* § 61.26(e), which "do[] not serve . . . any end users located" in urban areas, *id.* § 61.26(a)(6).

This case concerns what are known as intermediate carriers, which serve no end users directly but instead provide

connections between LECs and long-distance carriers. *See* In re Access Charge Reform ("Eighth Report and Order"), 19 FCC Rcd. 9108, 9116–17 ¶ 17 (2004) (discussing the role of intermediate carriers in the long-distance telephone market). By making connections to the LECs scattered across a region, intermediate carriers enable long-distance carriers to connect to a single central location rather than to each individual LEC.

Petitioner Great Lakes Comnet, Inc. operates as an intermediate carrier in Michigan. Westphalia Telephone Company, the other petitioner here, serves as its billing agent. AT&T, a long-distance carrier, relies on Great Lakes' network to receive certain 8YY calls, the technical term for toll free calls such as 1-800 calls. The 8YY calls at issue, all made by wireless callers, are routed from around the country to a CLEC in Southfield, Michigan, called Local Exchange Carriers of Michigan, Inc. or LEC-MI. In re AT&T Services Inc. v. Great Lakes Comnet, Inc., 30 FCC Rcd. 2586, 2590 ¶ 14 (2015) (describing the arrangement in which the traffic is routed from wireless callers around the country to LEC-MI). Great Lakes transfers the calls from LEC-MI to AT&T, which in turn directs the calls to the businesses that purchase the 8YY services from AT&T.

This case arose in 2014 when AT&T filed a formal complaint with the Commission alleging that for several years Great Lakes had charged it access fees that violated the benchmark rates. In response, Great Lakes argued that it is not subject to benchmark rate regulation because it is not a CLEC. Alternatively, Great Lakes argued that even if it does qualify as a CLEC, it is a rural CLEC exempt from the regulations. The Commission disagreed with Great Lakes on both counts and, after finding that Great Lakes charged AT&T an access rate nearly seven times higher than the

benchmark rate, granted AT&T's complaint in part, leaving resolution of damages to a later proceeding.

Great Lakes and Westphalia now petition for review. AT&T, joined by several other long-distance carriers that use Great Lakes' network, intervened on the side of the Commission.

**II.**

Under the Administrative Procedure Act, we must "determine whether the Commission's actions were 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Verizon v. FCC*, 740 F.3d 623, 635 (D.C. Cir. 2014) (quoting 5 U.S.C. § 706(2)(A)). We accept the Commission's "findings of fact so long as they are supported by substantial evidence on the record as a whole," *Communications Vending Corp. of Arizona v. FCC*, 365 F.3d 1064, 1069 (D.C. Cir. 2004), and will defer to the Commission's "reading of its own regulations unless that reading is 'plainly erroneous or inconsistent with the regulations,'" *Global Crossing Telecommunications, Inc. v. FCC*, 259 F.3d 740, 746 (D.C. Cir. 2001) (alteration omitted) (quoting *Auer v. Robbins*, 519 U.S. 452, 461 (1997)). "Where the Commission's failure to address or explain an issue leaves a court unable to understand Commission action, the appropriate course is to remand the case for further explanation." *National Cable Television Ass'n v. FCC*, 914 F.2d 285, 289 (D.C. Cir. 1990).

The first major dispute in this case concerns whether Great Lakes, as an intermediate carrier, qualifies as a CLEC, subject to benchmark rate regulation. *See* 47 C.F.R. § 61.26(b) ("[A] CLEC shall not file a tariff for its interstate switched exchange access services that prices those services above [the benchmark rate]."). Commission regulations define

a CLEC as a "local exchange carrier that provides some or all of the interstate exchange access services used to send traffic to or from an end user and does not fall within the definition of [an ILEC]." *Id.* § 61.26(a)(1). In this case, the Commission found that Great Lakes satisfied each part of this definition: it was "not an ILEC," and it "provide[d] some of the interstate exchange access services used to send traffic to or from an end user" when it "furnishe[d] tandem switched transport termination, tandem switched transport facility, and tandem switching." In re AT&T Services Inc., 30 FCC Rcd. at 2591 ¶ 20 (emphasis omitted).

Challenging the Commission's conclusion, Great Lakes argues that intermediate carriers fall outside the CLEC definition because they provide no service directly to end users. As the Commission pointed out, however, the regulation requires only that a CLEC provide "*some* of the interstate exchange access services used to send traffic to or from an end user," not that it connect directly to end users. *Id.* The Commission also explained that in its 2004 Eighth Report and Order it amended its regulations for the precise purpose of subjecting intermediate carriers to benchmark rate regulation. *Id.* at 2592 ¶ 21. In that order, the Commission added the "some or all" language to the CLEC definition and issued 47 C.F.R. § 61.26(f), which states that "[i]f a CLEC provides some portion of the switched exchange access services used to send traffic to or from an end user not served by that CLEC, the rate for the access services provided may not exceed the rate charged by the competing ILEC for the same access services." Explaining its rationale for taking these actions, the Commission expressly stated that it sought to apply benchmark rate regulation to intermediate carriers: "Because of the many disputes related to the rates charged by [CLECs] when they act as intermediate carriers, we conclude that it is necessary to adopt a new rule to address these

situations. Specifically, we find that the rate that a [CLEC] charges for access components *when it is not serving the end-user* should be no higher than the rate charged by the competing [ILEC] for the same functions." Eighth Report and Order, 19 FCC Rcd. at 9116 ¶ 17 (emphasis added). Given the clarity of the regulatory text and history, the Commission's conclusion that intermediate carriers like Great Lakes qualify as CLECs was hardly "plainly erroneous." *Auer*, 519 U.S. at 461. Neither of Great Lakes' two arguments to the contrary has merit.

First, Great Lakes asserts that the canon against surplusage requires limiting the CLEC definition so that it includes only those carriers that serve end users directly. That canon dictates that when construing a statute courts "give effect, if possible, to every clause and word." *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (internal quotation marks omitted). According to Great Lakes, the clause in the CLEC definition, "the interstate exchange access services used to send traffic to or from an end user," 47 C.F.R. § 61.26(a)(1), creates surplusage unless it is "read to mean that the definition only covers carriers that transmit traffic *directly* to or from an end user," Pet'rs' Br. 27, because all interstate exchange access services are used to send traffic to or from end users. The canon against surplusage typically applies when attempting to ascertain the meaning of a statute. Here, however, we seek to determine the meaning of a regulation, as to which the agency's interpretation generally receives controlling weight. *See Auer*, 519 U.S. at 461. In any event, the Supreme Court, has cautioned that the canon "is not an absolute rule," *Marx v. General Revenue Corp.*, 133 S. Ct. 1166, 1177 (2013), because "[w]hile it is generally presumed that statutes do not contain surplusage, instances of surplusage are not unknown," *Arlington Central School District Board of Education v. Murphy*, 548 U.S. 291, 299 n.1

(2006). Here, where the text and history of the regulation make its meaning clear, the canon against surplusage cannot dictate a different interpretation. *See Loving v. IRS*, 742 F.3d 1013, 1019 (D.C. Cir. 2014) (declining to read a statute contrary to its plain meaning simply to avoid surplusage).

Next, Great Lakes argues that the Commission's interpretation conflicts with its 2011 Transformation Order, which by 2018 will phase in a new framework for carrier rates. In re Connect America Fund ("Transformation Order"), 26 FCC Rcd. 17,663, 17,934–35 ¶ 801 (2011) (describing the transition). Once fully implemented, this framework, known as bill-and-keep, will require carriers to recoup their costs primarily from end users rather than from other carriers. *Id.* at 17,676 ¶ 34 ("Under bill-and-keep, carriers look first to their subscribers to cover the costs of the network . . . ."). According to Great Lakes, if intermediate carriers qualify as CLECs, the bill-and-keep framework will eventually require it to charge a rate of zero for its services. But we need not explore this argument because the bill-and-keep framework has no relevance to this case. The issue here is not what Great Lakes may charge once the transition to bill-and-keep is complete in 2018, but rather whether Great Lakes was subject to the Commission's benchmark rule in the years prior to AT&T's 2014 complaint. The Commission reasonably concluded that it was.

The second major dispute in this case concerns whether Great Lakes qualifies as a rural CLEC and thus is exempt from the Commission's benchmark rate regulations. 47 C.F.R. § 61.26(e) (allowing rural CLECs to charge rates above the benchmark rate). Commission regulations define a rural CLEC as "a CLEC that does not serve (i.e., terminate traffic to or originate traffic from) any end users" in an urban area. *Id.* § 61.26(a)(6). Great Lakes believes it qualifies for the

rural CLEC exemption because it serves no urban end users. In its Order, the Commission ruled otherwise, explaining that Great Lakes "stipulate[d] that it has transport facilities in urban areas, including Chicago, Illinois." In re AT&T Services Inc., 30 FCC Rcd. at 2595 ¶ 27 n.100. "Moreover," the Commission continued, "the 8YY wireless traffic, by its very nature, originates from locations throughout the country, including locations that are 'urban.'" *Id.*

The Commission's first reason is plainly erroneous. Commission regulations exclude a carrier from the exemption if it "serve[s] . . . any end users" in an urban area, not if it has "transport facilities" in an urban area. 47 C.F.R. § 61.26(a)(6). The Commission's second reason—that 8YY calls originate in urban locations—may well have merit. But the use of the word "moreover," defined by Webster's as "in addition to what has been said," Webster's Third New International Dictionary 1470 (1993), leaves us unable to determine whether the Commission believed this rationale was independently sufficient, such that it would have relied on it even if Great Lakes had no urban transport facilities. *See MCI Telecommunications Corp. v. FCC*, 917 F.2d 30, 39 (D.C. Cir. 1990) (remanding to the Commission because the court could not "tell from the [Commission's] order whether it considered [the arguably valid] portion of its explanation . . . to be independent of the impermissible [portion]"). Confusing matters further, at oral argument Commission counsel advanced still another basis for excluding Great Lakes from the exemption: that intermediate carriers may not qualify for the rural exemption under any circumstances. This too may have merit, but we cannot rely on it either because it appears nowhere in the Commission's order. *Ass'n of Civilian Technicians v. Federal Labor Relations Authority*, 269 F.3d 1112, 1117 (D.C. Cir. 2001) ("'The courts may not accept appellate counsel's post hoc rationalizations for agency

action.'" (quoting *Burlington Trucks Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962))). Unable to rely on Commission counsel's post hoc rationale or to decipher the Commission's reasoning in its Order, we follow our long-established rule that "[w]here the Commission's failure to address or explain an issue leaves a court unable to understand Commission action, the appropriate course is to remand the case for further explanation." *National Cable Television Ass'n*, 914 F.2d at 289.

Advancing a third challenge to the Order, Great Lakes alleges that the Commission selected the wrong ILEC for purposes of determining the applicable benchmark rate. Under Commission regulations, a CLEC's tariffed access rates "may not exceed the rate charged by the competing ILEC." 47 C.F.R. § 61.26(f); *see also id.* § 61.26(b). The regulations define the "competing ILEC" as the ILEC "that would provide interstate exchange access services, in whole or in part, to the extent those services were not provided by the CLEC." *Id.* § 61.26(a)(2). The Commission determined that AT&T Michigan—an affiliate of intervenor AT&T, though that coincidence has no bearing here—was the relevant competing ILEC because it was "an [ILEC] operating in and around Southfield, Michigan," In re AT&T Services Inc., 30 FCC Rcd. at 2591 ¶ 17, the location where LEC-MI handed off the 8YY traffic to Great Lakes. Great Lakes insists that the competing ILEC is instead the ILEC serving the 8YY caller, meaning that the competing ILEC will differ based on the location of the caller. Great Lakes misunderstands the relevant question. We are concerned not with which ILEC would have carried the traffic from the originating caller but rather with which ILEC would have carried the traffic from LEC-MI to AT&T had Great Lakes not inserted itself into the traffic path. The Commission reasonably concluded that AT&T Michigan, the ILEC operating in Southfield,

Michigan, would have done so, and Great Lakes does not challenge that conclusion.

We can quickly dispose of Great Lakes' remaining challenges. It asserts that the Commission's Order subjected it to an unlawful taking when it required Great Lakes to abide by bill-and-keep. But as explained above, *supra* p. 9, the Transformation Order, not the order under review, implements the bill-and-keep framework, so any challenges to the validity of that framework are not presently before us. Great Lakes also contends that because it expected that benchmark rate regulation would not apply to intermediate carriers, the Commission erred when it applied the regulations to it retroactively. Although agencies may not, as Great Lakes emphasizes, apply their adjudications retroactively where doing so will upset "reasonable" expectations, *Qwest Services Corp. v. FCC*, 509 F.3d 531, 540 (D.C. Cir. 2007), the company's expectations were hardly reasonable given the Commission's 2004 Eighth Report and Order. As the Commission points out in its brief, and as we explain above, *supra* pp. 7–8, that order "explicitly appl[ies] the benchmark rule to . . . intermediate carriers, such as Great Lakes, that do not directly serve end users." Resp'ts' Br. 36. Great Lakes had no response to this point in its reply brief. Finally, Great Lakes is concerned that the Commission has already passed judgment on its claim that the applicable statute of limitations bars some of AT&T's alleged damages, a claim that Great Lakes believes should be left to the separate damages phase of the proceedings. The Commission acknowledges in its brief, however, that it had no intention of prejudging the statute of limitations issue, and at oral argument it agreed the issue remains an "open question," Oral Arg. Rec. 30:08–09.

**III.**

For the foregoing reasons, we remand the rural exemption issue to the Commission for further consideration and deny the petition for review in all other respects.

*So ordered.*