# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued September 13, 2016          Decided May 26, 2017

No. 15-1080

NEUSTAR, INC.,
PETITIONER

v.

FEDERAL COMMUNICATIONS COMMISSION AND UNITED
STATES OF AMERICA,
RESPONDENTS

CTIA - THE WIRELESS ASSOCIATION, ET AL.,
INTERVENORS

———

Consolidated with 16-1293

———

On Petitions for Review of Orders of
the Federal Communications Commission

———

*Kannon K. Shanmugam* argued the cause for petitioner. With him on the briefs were *Marcie R. Ziegler*, *James E. Gillenwater*, *Amy E. Murphy*, *Tyrone Brown*, *Andrew G. McBride*, *Thomas J. Navin*, and *Brett A. Shumate*.

*David M. Gossett*, Deputy General Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were *William J. Baer*, Assistant Attorney General, *Robert B. Nicholson* and *Scott A. Westrich*, Attorneys, *Jonathan B. Sallet*, General Counsel, Federal Communications Commission, *Jacob M. Lewis*, Associate General Counsel, and *Lisa S. Gelb* and *C. Grey Pash Jr.*, Counsel. *Richard K. Welch*, Deputy Associate General Counsel, Federal Communications Commission, entered an appearance.

*Peter Karanjia* argued the cause for Association Intervenors. With him on the brief were *Christopher J. Wright*, *John T. Nakahata*, *Mark D. Davis*, *William B. Sullivan*, *John R. Grimm*, and *James M. Smith. Timothy J. Simeone* entered an appearance.

Before: TATEL, *Circuit Judge*, and EDWARDS and SENTELLE, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* SENTELLE.

SENTELLE, *Senior Circuit Judge*: Neustar, Inc. petitions for review of orders of the Federal Communications Commission ("FCC" or the "Commission") naming another company to replace Neustar as the Local Number Portability Administrator ("LNPA" or "LNP Administrator"). Petitioner argues that the Commission erred in not properly determining issues relating to the new Administrator's corporate affiliations. Finding no error in the Commission's decision, for the reasons set forth below, we deny the petitions.

## I.    BACKGROUND

The Telecommunications Act of 1996 ("Act") requires telecommunications providers to provide "portability" of telephone numbers, permitting customers to retain their current numbers when switching carriers. 47 U.S.C. § 251(b)(2); *see also* 47 U.S.C. § 153(37). To effectuate this requirement, the FCC must "create or designate one or more impartial entities to administer telecommunications numbering and to make such numbers available on an equitable basis." 47 U.S.C. § 251(e)(1).

In its 1996 First Report and Order and Further Notice of Proposed Rulemaking, FCC 96-286, 11 FCC Rcd. 8352 (1996), the FCC "conclude[d] that it is in the public interest for the number portability databases to be administered by one or more neutral third parties," *id.* ¶ 92, 11 FCC Rcd. at 8400-01 ¶ 92. Consequently, the Commission "direct[ed] the [North American Numbering Council ("NANC" or "Council")] to select as a local number portability administrator(s) . . . one or more independent, non-governmental entities that are not aligned with any particular telecommunications industry segment . . . ." *Id.* ¶ 93, 11 FCC Rcd. 8401 ¶ 93. This led to the creation of the LNP Administrator. The NANC LNPA Selection Working Group issued its report ("Working Group Report") on April 25, 1997. *See generally* North American Numbering Council, *Local Number Portability Administration Selection Working Group* (Apr. 25, 1997). In this report, the NANC recommended Lockheed Martin IMS ("Lockheed"), predecessor of Neustar, and Perot Systems, Inc. to serve as LNPAs. *Id.* § 6.2.4; *see Second Report and Order*, FCC 97-289 ¶ 25, 12 FCC Rcd. 12281, 12298 ¶ 25 (Aug. 18, 1997). The FCC generally adopted the recommendations of the Working Group in its 1997 Second Report and Order. *Second Report and Order*, FCC 97-289 ¶ 33, 12 FCC Rcd. 12281,

12303 (1997). In 1998, Perot Systems experienced significant performance difficulties and Lockheed became administrator for the entire country.

In 1999, upon finding that Lockheed did not meet the neutrality criteria, the FCC issued an order allowing the LNPA contract to be transferred to a new independent affiliate: Neustar, Inc. *Order*, FCC 99-346 ¶ 1 (Nov. 17, 1999). It found "that Neu[s]tar, as currently structured and with the additional safeguards imposed herein, is in compliance with our neutrality criteria." *Id.* As a result of the transfer of the LNPA contract, Neustar is the incumbent LNPA. *See March 2015 Order*, FCC 15-35 ¶ 7.

In 2009, Telcordia, a wholly owned subsidiary of Ericsson, petitioned the FCC "to institute a competitive bid process for the LNPA contract" and the FCC subsequently began a collaborative public process to develop the procedures to select the next LNPA. *Id.* ¶¶ 8-10. After this interactive process and the release of the bid documents, two companies submitted bids: Neustar and Telcordia. *Id.* ¶¶ 8-11. Following the review of these initial bids, the Commission issued a solicitation for Best and Final Offers ("BAFO"). Each company submitted a BAFO. *Id.* Just over a month later, Neustar submitted a second, unsolicited BAFO, which the NANC refused to consider. *Id.* After reviewing the bids, the NANC ultimately "recommended the selection of Telcordia as the sole LNPA . . . ." *Id.* ¶ 12. Neustar objected to this recommendation on procedural grounds concerning the selection process, *see id.* ¶ 14, and on substantive grounds regarding costs and the bidders' qualifications, *see id.* ¶¶ 65, 134, and "challeng[ed] Telcordia's neutrality showing," *id.* ¶ 167.

In its March 2015 Order approving recommendation of Telcordia as the LNPA, the FCC specifically addressed these

concerns. *See id.* ¶¶ 14-198. First, contrary to Neustar's procedural objections, the FCC determined that selection of the LNPA does not require notice-and-comment rulemaking and "this proceeding is properly viewed as an informal adjudication." *Id.* ¶ 18; *see id.* ¶¶ 15, 18. Neustar had argued that because the prior selection of the LNPAs was incorporated into FCC rules, the selection of a new LNPA must be accomplished by a rulemaking to amend the existing rules. The FCC also sustained the rejection of Neustar's second BAFO. *Id.* ¶ 37.

The FCC further determined that both bidders were qualified to serve as the LNPA, *id.* ¶ 81, and that the cost analysis warranted recommending Telcordia as the next LNPA, *id.* ¶ 153.

As to neutrality, Neustar argued that Telcordia could not be neutral because its parent company, Ericsson, is an equipment manufacturer and service provider. *Id.* ¶ 169. Neustar maintained further that Ericsson, as Telcordia's sole owner, must be evaluated for alignment, undue influence, and whether it is a manufacturer of telecommunications network equipment. *Id.* The FCC rejected this argument.

The FCC did, however, order the imposition of further safeguards and found "that, when considered together in light of the safeguards and conditions . . . adopt[ed] in this Order, Telcordia will not be subject to undue influence by Ericsson, nor will Ericsson adversely affect Telcordia's ability to serve as a neutral LNPA." *Id.* ¶ 168.

The FCC supported its neutrality determination with several points. First, it emphasized that the challenged telecommunications sector connections were with Ericsson, not Telcordia. *Id.* ¶ 172. The FCC determined that "even to

the extent Ericsson is 'aligned with' the wireless industry as that term is understood in our neutrality rules, it does not follow that Telcordia is so aligned." *Id.* n.593. It grounded this conclusion on a finding that "Telcordia is a separate company with a separate independent board of directors, each of whom owes fiduciary duties to Telcordia." *Id.* ¶ 172. The Commission further analyzed Telcordia's independence, reasoning that this independence is sustainable, "particularly when considered in conjunction with the conditions that we impose in this Order." *Id.* ¶ 172. The FCC emphasized that it "has, and will exercise ample authority to ensure that the contract includes targeted conditions to ensure that the LNPA is neutral and remains neutral throughout the term of the contract." *Id.* ¶ 173. It further stressed that neutrality is a key consideration and that regulations governing the LNPA and conditions it adopted in the Order were crafted "to ensure that such neutrality is preserved." *Id.* ¶ 179. The Commission further noted that Telcordia had implemented a number of safeguards described in its neutrality showing that, taken together with the conditions imposed in the Order, led the Commission to conclude "that Telcordia meets our neutrality requirements." *Id.*

After detailing some of the conditions, including corporate structure, a majority independent board of directors, a biannual neutrality audit and a Code of Conduct, the FCC addressed the specific concern that "Ericsson might be tempted to prioritize those [other] contracts and sales over the LNPA contract." *Id.* ¶¶ 179-81. It recognized that Ericsson's role as Telcordia's sole owner "could present opportunities for Ericsson to exert undue influence over Telcordia." *Id.* ¶ 181. The Commission described the concerns about Ericsson as being "somewhat speculative" but did "acknowledge that they reflect[ed] potential incentive and ability" for Telcordia to benefit its parent corporation. *Id.*

However, the Commission further concluded that its rules provided the flexibility to deal with the potential for undue influence that might impair neutrality. It noted that the FCC had "historically addressed such concerns by imposing conditions on the numbering administrators" and that it was doing so in the Order. *Id.* In keeping with this finding, the Commission "require[d] a condition that will restrict Ericsson's ability to exert undue influence on Telcordia by limiting Ericsson's direct influence on Telcordia's board of directors": a voting trust. *Id.* ¶ 182. It ordered that Telcordia adopt the proposed Code of Conduct with additional FCC-imposed conditions specifically targeted at this dynamic. *Id.* ¶ 186. After considering the comments and concerns in the record, it concluded that Telcordia was not "*per se* precluded from serving as the LNPA" by Commission rules, precedent, or any other reason. *Id.* ¶ 188. It further concluded that, given the safeguards and conditions set forth in the order, "Telcordia has demonstrated its commitment to maintain neutrality in its LNPA operations . . . ." *Id.* The Commission therefore determined that Telcordia met the neutrality requirements for appointment as the LNPA. The Commission required that the Code of Conduct "be finalized," the voting trust be formed, and the appointment of trustees and independent directors be "in effect prior to Telcordia commencing to provide LNPA services . . . ." *Id.*

Finally, the FCC ordered "that the North American Portability Management LLC, with Commission oversight, is directed to negotiate the proposed terms of the LNPA contract in accordance with this Order, and submit the proposed contract to the Commission for approval." *Id.* ¶ 199. On July 25, 2016, following successful contract negotiations and satisfaction of its conditions, the FCC issued a final decision. *In the Matters of Telcordia Technologies, Inc. Petition to*

*Reform Amendment 57 and to Order a Competitive Bidding Process for Number Portability Administration*, FCC 16-92 ¶ 1, 2016 WL 4006478, at *1 ¶ 1 (July 25, 2016) (*July 2016 Order*).

Neustar petitions this Court for review.

## II.   DISCUSSION

On petition to this Court, Neustar reiterates the arguments it made to the FCC regarding the LNPA selection process and Telcordia's fitness to serve as the LNPA.  Neustar argues that (1) the FCC violated the Administrative Procedure Act ("APA") by failing to engage in notice-and-comment rulemaking, (2) the FCC's selection of Telcordia was contrary to law or arbitrary and capricious based on an improper understanding and application of the neutrality regulations and its approach to Ericsson as Telcordia's sole corporate parent, and (3) the FCC's evaluation of the parties' bid costs was arbitrary and capricious.  The FCC moved to dismiss the petition, arguing that this Court does not have jurisdiction.  For the reasons discussed below, we conclude that this Court has jurisdiction, that the Order does not qualify as a rule, and that there is no requirement of notice-and-comment rulemaking when selecting the LNPA.  We further hold that neither the FCC's neutrality determination nor its cost analysis was arbitrary and capricious and that the FCC's BAFO determination was not arbitrary and capricious.

### A.  Jurisdiction

The FCC initially asserted that this Court lacked jurisdiction to hear Neustar's petition to review the challenged March 2015 Order.  The Commission moved to dismiss the

petition for review on the ground that the Order is not final for purposes of judicial review under the Hobbs Act, 28 U.S.C. § 2342(1), and § 402(a) of the Communications Act, 47 U.S.C. § 402(a). The Commission correctly notes that this Court's jurisdiction extends "only to final orders" of the FCC. *See N. Am. Catholic Educ. Programming Found. v. FCC*, 437 F.3d 1206, 1209 (D.C. Cir. 2006) (emphasis removed); *see also Blue Ridge Envtl. Def. League v. NRC*, 668 F.3d 747, 753 (D.C. Cir. 2012).

On August 18, 2016, however, in Case No. 16-1293, Neustar filed a petition for review of the FCC's July 2016 Order approving the terms of a proposed contract for Telcordia to serve as the next Administrator. On September 1, 2016, Petitioner made an unopposed motion for consolidation of its petitions for review in *Neustar, Inc. v. Federal Communications Commission*, Nos. 15-1080 and 16-1293, asserting that consolidation would "serve to moot any potential jurisdictional objection . . . ." We granted that motion and consolidated the cases. Given the second petition and consolidation of the cases, the FCC's jurisdictional argument is moot.

## B. Notice-and-Comment Rulemaking

### 1. Rulemaking Requirements and Promulgation Under § 251

Neustar argues that, because § 251 requires that the FCC issue regulations to implement the statute's requirements, the FCC must use rulemaking procedures whenever it acts under § 251. In support, it urges that the Supreme Court, in *AT&T Corp. v. Iowa Utilities Board*, 525 U.S. 366, 383 n.9 (1999), "recognized that 'Section 251(e) . . . *requires* the Commission to exercise its rulemaking authority.'" Neustar asserts again that the FCC's prior LNPA selection was "the product of

notice-and-comment rulemaking" and thus, because the Order in this case effectively repealed that prior rule by recommending a new LNPA, the new LNPA recommendation should have followed notice-and-comment rulemaking procedures. The FCC maintains that it appropriately selected the new LNPA through informal adjudication and that it does not "read [its] rules to incorporate a particular LNPA or to require amendment when selecting a new one." *See March 2015*, FCC 15-35 ¶¶ 18, 23.

Section 251 of Title 47, United States Code, provides in subsection (d) that generally "[w]ithin 6 months after February 8, 1996, the Commission shall complete all actions necessary to establish regulations to implement the requirements of this section." 47 U.S.C. § 251(d)(1). Subsection (e) addresses numbering administration and empowers the Commission to "create or designate" an impartial entity or entities to administer the telecommunications numbering system. *See* § 251(e).

Subsection (d) only requires that the FCC "establish regulations to *implement* the requirements of this section." § 251(d) (emphasis added). In keeping with this requirement, regulations establishing the selection process and how it would select administrators properly provide a means to implement the statute, even though the regulations in of themselves would not satisfy ultimate statutory requirements such as selecting the administrator. Thus, the statute's text does not compel that all of the statutory requirements be implemented through rulemaking. The text is broad enough to encompass the processes to *implement* the statutory requirements through rulemaking even if the ultimate outcomes are achieved via another process, such as informal adjudication. *See id.* We also agree with the FCC that it has not incorporated a specific LNPA by rule and thus the selection of a new LNPA need not

follow rulemaking procedures either. *See March 2015*, FCC 15-35 ¶ 23.

In addition to the fact that the statute itself does not require that every administrator be selected through rulemaking, review of the FCC's use of its rulemaking and regulatory authority under this statute illustrates the distinction between what must be achieved through rulemaking under the statute and what may be achieved through informal adjudication. We review administrative decisions such as the one before us against a background understanding that agencies perform their administrative functions both through rulemaking and adjudication. *See generally SEC v. Chenery Corp.*, 332 U.S. 194 (1947). The FCC "has very broad discretion to decide whether to proceed by adjudication or rulemaking." *Conference Grp., LLC v. FCC*, 720 F.3d 957, 965 (D.C. Cir. 2013) (citations omitted).

Rulemaking scenarios generally involve broad applications of more general principles rather than case-specific individual determinations. "This maxim of administrative law permits an agency to develop a body of regulatory law and policy either through case-by-case decisionmaking (a quasi-adjudicative process) or through rulemaking (a quasi-legislative process)." *Am. Tel. & Tel. Co. v. FCC*, 978 F.2d 727, 731 (D.C. Cir. 1992). A rulemaking under § 251(e) would more properly encompass an action such as "adoption of a rule stating that '[t]oll free numbers shall be made available on a first-come, first-served basis unless otherwise directed by the Commission.'" *See Kristin Brooks Hope Ctr. v. FCC*, 626 F.3d 586, 588 (D.C. Cir. 2010) (citation omitted).

By contrast, agencies may use informal adjudications when they are not statutorily required "to engage in the notice

and comment process" or to "hold proceedings on the record . . . ." *See Safe Extensions, Inc. v. FAA*, 509 F.3d 593, 604 (D.C. Cir. 2007). Informal adjudications may be used in highly fact-specific contexts, *see Nat'l Biodiesel Bd. v. EPA*, 843 F.3d 1010, 1017-18 (D.C. Cir. 2016), and lack "the hallmarks of legislative rulemaking," *Conference Grp.*, 720 F.3d at 965. These informal adjudications still must comply with the familiar APA standard banning arbitrary and capricious actions. *See* 5 U.S.C. § 706(2)(A); *Occidental Petrol. Corp. v. SEC*, 873 F.2d 325, 337 (D.C. Cir. 1989).

In short, while promulgating procedures for how to select a new LNPA may appropriately be done by rulemaking, the actual recommendation of the next LNPA is an individualized selection process that is sufficiently adjudicatory in nature to fall outside the scope of any requirement that the FCC promulgate rules to carry out § 251.

The history surrounding the selection of prior LNPAs is consistent with this textual analysis. *See March 2015 Order*, FCC 15-35 ¶¶ 23-26. For example, early in the history of the application of the Act and the associated regulations, the FCC stated that, in its implementation of the statute, it had entered the *Local Competition Second Report and Order*, in which it concluded that the *NANP Order* satisfied the requirements of § 251(e)(1) for the creation or designation of an impartial numbering administrator. It further noted the requirement for the initiation of a new, impartial number administrator and "established the model for how that administrator would be chosen." *Third Report and Order and Third Report and Order*, FCC 97-372 ¶ 8 (Oct. 9, 1997). It had therefore at that time taken "'action necessary to establish regulations'" for the designation of such an impartial administrator and therefore met the requirements of § 251(e)(1). *Id.*

Thus, the FCC itself has interpreted the statutory mandate as encompassing measures to *implement* the ultimate requirement to designate an administrator—such as "establish[ing] the model for how that administrator would be chosen." *Id.* While not determinative, this past practice at least illustrates how the scheme has previously functioned.

However, the FCC's interpretation of the statutory mandate is not entitled to deference in this case. The FCC's brief nominally references *Chevron*'s deferential standard in its standard of review but did not invoke this standard with respect to rulemaking. Consequently, it has forfeited any claims to *Chevron* deference. *See Lubow v. U.S. Dep't of State*, 783 F.3d 877, 884 (D.C. Cir. 2015) (noting *Chevron* deference is not jurisdictional and can be forfeited). *See generally Silver State Land, LLC v. Schneider*, 843 F.3d 982 (D.C. Cir. 2016) (deciding statutory matter without citing *Chevron*). Similarly, review of the relevant agency orders shows no invocation of *Chevron* deference for this matter.

In any event, upon our review of the statute, we hold that § 251's general regulatory mandate from Congress does not require that each new administrator be selected by notice-and-comment rulemaking procedures. Petitioner cites to a footnote regarding § 251(e) in *AT&T Corp. v. Iowa Utilities Board*, 525 U.S. 366 (1999), in which the Supreme Court stated that "[§] 251(e), which provides that '[t]he Commission shall create or designate one or more impartial entities to administer telecommunications numbering,' *requires* the Commission to exercise its rulemaking authority, as opposed to § 201(b), which merely authorizes the Commission to promulgate rules if it so chooses." *Id.* at 383 n.9; *see also id.* at 384 ("[Section] 251 specifically *requires* the Commission to promulgate regulations implementing that provision . . . ."). This dicta, *see id.* at 383, is not directed to any situation parallel to the question

raised in the present case. As we hold in this case, the FCC may, in keeping with the statute, choose to use informal adjudication to select an administrator, an activity that does not have any of the distinctions of legislative rulemaking.

For these reasons, we hold that § 251 does not mandate that selection or recommendation of an administrator must be done through rulemaking procedures.

## 2. Rules Under the APA

Second, the FCC's Order in this case does not qualify under the statutory definition of a "rule," so rulemaking procedures are not required.

Under the APA and as noted in *Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199 (2015), a rule "is defined broadly to include 'statements of general or particular applicability and future effect' that are designed to 'implement, interpret, or prescribe law or policy.'" *Id.* at 1203 (quoting 5 U.S.C. § 551(4)) (alteration omitted). By contrast, "'adjudication' means agency process for the formulation of an order . . . ." 5 U.S.C. § 551(7). "'[O]rder' means the whole or part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing . . . ." *Id.* § 551(6).

Statutory interpretation can be "rendered in the form of an adjudication, not only in a rulemaking." *Conference Grp.*, 720 F.3d at 958. "The fact that an order rendered in an adjudication 'may affect agency policy and have general prospective application,' does not make it rulemaking subject to APA section 553 notice and comment." *Id.* at 966 (citing *N.Y. State Comm'n on Cable Television v. FCC*, 749 F.2d 804, 814 (D.C. Cir. 1984)). Further, as a general matter, "[i]n interpreting and

administering its statutory obligations under the Act, the Commission has very broad discretion to decide whether to proceed by adjudication or rulemaking." *Conference Grp.*, 720 F.3d at 965 (citing *Qwest Servs. Corp. v. FCC*, 509 F.3d 531, 536 (D.C. Cir. 2007); *Time Warner Entm't Co. v. FCC*, 240 F.3d 1126, 1141 (D.C. Cir. 2001)).

In this case, the Order under review determined the rights and obligations of two parties, Telcordia and Neustar, that were then entitled to negotiate for the LNPA contract. It applied existing rules and regulations to Telcordia and determined Telcordia's rights as the winning bidder in a fact-intensive determination that occurred on a case-by-case basis. As we have stated in a different context, "[g]iven the fact-intensive nature of the Commission's role in these proceedings, it is surely within the agency's authority to proceed on a case-by-case basis rather than by rulemaking." *Busse Broad. Corp. v. FCC*, 87 F.3d 1456, 1463-64 (D.C. Cir. 1996) (citing *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294 (1974)). This individualized determination was not intended to impact law or policy; rather, it resolved interests in a specific bidding competition. *Cf. Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 221 (1988) (Scalia, J., concurring) ("Adjudication deals with what the law was; rulemaking deals with what the law will be." (emphasis removed)).

Neither does some tangential impact on other entities necessarily transform an informal adjudication into a rulemaking since "the nature of adjudication is that similarly situated non-parties may be affected by the policy or precedent applied, or even merely announced in dicta, to those before the tribunal." *Goodman v. FCC*, 182 F.3d 987, 994 (D.C. Cir. 1999) (citing *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 765-66 (1969)). Similarly, seeking public comment is not determinative of whether an action qualifies as a rulemaking or

as an informal adjudication since "the agency may seek comment in either a rulemaking or an adjudicatory proceeding." *Id.* The FCC's interactive public process in this case, therefore, is not determinative of its APA status.

Given all these considerations, the FCC's Order in this case does not meet the APA's definition of a rule and does not require a rulemaking.

Additionally, "[t]he general principle is that when as an incident of its adjudicatory function an agency interprets a statute, it may apply that new interpretation in the proceeding before it." *Clark-Cowlitz Joint Operating Agency v. FERC*, 826 F.2d 1074, 1081 (D.C. Cir. 1987) (en banc) (citations omitted) (collecting cases). Review of the cited support for this proposition reveals a focus on adjudicatory holdings as inherently retroactive and on rulemaking rules and policies as inherently prospective. *See id.* (detailing the specific circumstances in which "a retrospective application can properly be withheld").

Petitioner, relying on *Catholic Health* and *Goodman*, argues that adjudications must have retroactive effect, even if they also have some prospective impact. *See Catholic Health Initiatives Iowa Corp. v. Sebelius*, 718 F.3d 914, 921-22 (D.C. Cir. 2013) ("[A]n adjudication *must* have retroactive effect, or else it would be considered a rulemaking."); *Goodman*, 182 F.3d at 994-95 (for the proposition that adjudications *may* have prospective effects but *must* have retroactive effects). While Petitioner is correct regarding the general distinction between an informal adjudication and a rulemaking, it oversimplifies this distinction and its application in the present case.

In *Catholic Health*, we held that although adjudication is by its nature retroactive, it may be proper to enter an

adjudicatory order without retroactive effect. We went on to observe that, "[b]y 'retroactive effect,'" we are usually referring to an order or penalty with economic consequences, "not retroactive application of the rule itself." 718 F.3d at 921-22 (citing *Williams Nat. Gas Co. v. FERC*, 3 F.3d 1544, 1554 (D.C. Cir. 1993); *Wyman-Gordon Co.*, 394 U.S. at 763-66). And *Goodman* discussed retroactivity as an aspect of adjudicatory decisions in contrast to rules, which include "an 'agency statement of . . . future effect.'" 182 F.3d at 994 (quoting 5 U.S.C. § 551(4)). This prospective-retroactive distinction consistently focuses on the application of principles in the past or future. As this Court has previously explained, because the APA "does not countenance agency use of adjudicatory powers to announce *rules* of prospective effect only, it seems clear that the circumstances in which a rule may be announced but not applied in an adjudication are few." *Gen. Am. Transp. Corp. v. ICC*, 872 F.2d 1048, 1060-61 (D.C. Cir. 1989) (emphasis added). In sum, "a *principle* announced in adjudication is necessarily retroactive . . . ." *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 196 (D.C. Cir. 2009) (emphasis added) (citing *Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 311-12 (1994); *Goodman*, 182 F.3d at 994)).

Thus, while Petitioner properly articulates this general principle, its invocation in this case is inapt, as the question at hand is whether the actual selection of the administrator may have prospective effect and still qualify as an informal adjudication. Petitioner never makes clear what retroactive effect is missing in this Order. The Order does not state a general principle that fails to relate back. Petitioner's argument appears to be that any adjudication without a visible retroactive effect must be a rulemaking. This argument proves far too much. Various agencies regularly make licensure and authorization decisions of various sorts that affect the future rights and authorizations of the parties before them. None of

our precedents require that these must all be done by rulemaking rather than by informal adjudication. We reiterate that adjudications by nature are likely to be specific to individuals or entities, while rules tend to be matters of more general application. *See Heckler v. Ringer*, 466 U.S. 602, 614 (1984).

Consequently, precedent supports the determination in this case that the Order reflects an informal adjudication. In a fashion more akin to a licensing, as argued by Respondents, the key and immediate effect in this case is on the bidding parties, Telcordia and Neustar, by determining which entity is authorized to negotiate for the LNPA contract. The Commission explained that this decision was based on the application of a pre-existing process to the specific bidding entities, not on the announcement of any new principles or rules. Thus, precedent regarding the retroactivity of principles issued in adjudications is inapposite to an informal adjudication having immediate effects on the individuals concerned.

Because the FCC's Order does not fall within the APA's definition of a rule and qualifies as an informal adjudication, it is not subject to notice-and-comment procedures.

## C. The FCC's Neutrality Determination

Under the APA, a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Courts will "accept the Commission's findings of fact so long as they are supported by substantial evidence on the record as a whole, and will defer to the Commission's reading of its own regulations unless that reading is plainly erroneous or inconsistent with the regulations[.]" *Great Lakes Comnet, Inc.*

*v. FCC*, 823 F.3d 998, 1002 (D.C. Cir. 2016) (citations and internal quotation marks omitted). Neustar's challenge to the FCC's approval of the recommendation of Telcordia fails. The FCC's determination that, given specified safeguards, Telcordia satisfied the Act's requirements and the FCC's regulations was not arbitrary and capricious.

As discussed above, the Act requires that the FCC "create or designate one or more impartial entities to administer telecommunications numbering . . . ." 47 U.S.C. § 251(e)(1). The regulations then define the LNPA as "an independent, non-governmental entity, not aligned with any particular telecommunications industry segment, whose duties are determined by the NANC." 47 C.F.R. § 52.21(k). The regulations separately state that an administrator

> shall be [a] non-governmental entit[y] that [is] impartial and not aligned with any particular telecommunication industry segment. *Accordingly*, while conducting [its] respective operations under this section, the [Administrator] shall ensure that [it] compl[ies] with the following neutrality criteria:
>
> (i) The [Administrator] may not be an affiliate of any telecommunications service provider(s) as defined in the Telecommunications Act of 1996 . . . . ;
>
> (ii) The [Administrator] and any affiliate thereof, may not issue a majority of its debt to, nor may it derive a majority of its revenues from, any telecommunications service provider. . . . ;

>(iii*)* Notwithstanding the neutrality criteria set forth in paragraphs (a)(1)(i) and (ii) of this section, the [Administrator] may be determined to be or not to be subject to undue influence by parties with a vested interest in the outcome of numbering administration and activities. NANC may conduct an evaluation to determine whether the [Administrator] meet[s] the undue influence criterion.

47 C.F.R. § 52.12(a)(1) (emphasis added).

Giving meaning to the term "accordingly," the FCC determines whether an entity is impartial and not aligned based on an evaluation of the entity under these three neutrality criteria. Once the FCC found that Telcordia had satisfied the neutrality requirements in § 52.12(a)(1)(i)-(iii), the FCC could properly find that it was independent and not aligned as set out under the regulations in § 52.12(a)(1) and in the definitional section in § 52.21(k).

This regulatory analysis reflects the FCC's interpretation of its own regulations. The FCC's current interpretation is consistent with its prior view of the interaction between these requirements included in an August 26, 2004 Order modifying the conditions on Neustar as the Administrator. *See In the Matter of North American Numbering Plan Administration Neustar Inc.*, FCC 04-203, 19 FCC Rcd. 16982 (Aug. 26, 2004). There, the FCC explained:

>Section 52.12 of the Commission's rules addresses the NANPA neutrality requirements. Specifically, section 52.12(a)(1) states that the NANPA must be a non-governmental entity, not aligned with any particular industry

segment. *Thus*, a TSP may not be the NANPA. Furthermore, the NANPA may not be an affiliate of a TSP. The Commission's rules state that the majority of the NANPA's debt must not be issued to, nor may a majority of the NANPA's revenues be received from, a TSP. In addition, the NANPA must not be subject to undue influence of any party with a vested interest in numbering administration.

*Id.* ¶ 10 (emphasis added). Illustratively, the FCC's 2004 explanation also reflects its understanding that the three specific requirements regarding TSP connections and undue influence flow directly (connoted by the term "thus") from the requirement that administrators be non-governmental entities and not aligned. *See id.*

A similar understanding is reflected in the Wireline Competition Bureau's final 2015 LNPA vendor qualification survey, which was "the first step in the [Request for Proposal] process" and solicited detailed responses from the parties. Wireline Competition Bureau, *2015 Vendor Qualification* 1 (Feb. 4, 2013). That survey states that, "[i]n accordance with law and FCC regulations," for an entity to be recommended for selection as the LNPA, it must meet the requirements set forth above and further meet the criteria that it (1) not be, own, be owned by, or be an affiliate of a Telecommunications Service Provider; (2) "not issue[] a majority of its debt to, nor derive a majority of its revenues . . . from, any Telecommunications Service Provider"; and (3) not be "subject to undue influence by parties with a vested interest in the outcome of numbering administration and activities . . . ." *Id.* at 10-11. The FCC employed a similar understanding in the Order at issue in this case, as it explained that the Commission has applied the neutrality criteria set forth in § 52.12 of its rules since their

adoption and, in particular, that the Commission has required the Administrator to be impartial, non-governmental, and not aligned with any industry segment. *March 2015 Order*, FCC 15-35 ¶ 160 (citing 47 C.F.R. §§ 52.12, 52.21(d), (k)); *see also id.* ¶ 164. In that Order, the Commission noted that "[t]his is the first opportunity that the Commission has had to consider the neutrality of a newly selected LNPA under the neutrality requirements as codified in section 52.12 of our rules." *Id.* ¶ 164. Thus, the FCC has consistently interpreted these regulations as providing that neutrality requires an entity to be impartial and not aligned and, to achieve that goal (connoted by the terms "accordingly"; "thus"; or "require[s] that"), the entity first must satisfy the three neutrality requirements.

Further, the regulation itself provides in Shakespearian terms that the Administrator "may be determined to be or not to be subject to undue influence" and does not prohibit the use of safeguards when determining whether an entity is subject to such influence. *See* 47 C.F.R. § 52.12(a)(1)(iii). This breadth allows the FCC to determine whether safeguards could permit an entity to satisfy these criteria and qualify to serve as the Administrator. *See March 2015 Order*, FCC 15-35 ¶ 181. By way of illustration, in the Order before us, the FCC analogized to prior uses of other types of safeguards that were tailored to the unique concerns raised by the entity at issue. *Id.* ¶ 160. More specifically, the Commission stated: "For example, in evaluating Neustar's ability to serve as a neutral North American Numbering Plan Administrator when it changed from a privately held company to a publicly held company, the Commission determined that no telecommunications service provider (TSP) or TSP affiliate may own five percent or more of Neustar's stock." *Id.* (citation omitted). It then explained that it had "undertaken a careful and . . . extensive review of Telcordia's fitness to serve as a neutral LNPA." *Id.* ¶ 164.

A major concern involves Telcordia's status as a wholly owned subsidiary of Ericsson, a Swedish company manufacturing communications equipment and software and providing managed network services. "Neustar asserts that . . . each of these areas provide Ericsson with an opportunity to affect Telcordia's neutrality . . . ." *Id.* ¶ 162. Upon analysis of this relationship, the FCC looked at the corporate structure and related business arrangements to find Telcordia satisfied the neutrality criteria "particularly when considered in conjunction with the conditions [also referred to as safeguards] that we impose in this Order." *Id.* ¶ 172. It explained that, consistent with its past practice, "the Commission has, and will[,] exercise ample authority to ensure that the contract includes targeted conditions to ensure that the LNPA is neutral and remains neutral throughout the term of the contract." *Id.* ¶ 173.

Most specifically, the FCC emphasized the importance of the LNPA but expressly stated that "our regulations concerning the qualifications of the LNPA and the conditions that we adopt in this Order are designed to ensure" that neutrality would be preserved. *Id.* ¶ 179. It further observed that Telcordia already implemented some of the safeguards in its neutrality showing and that such safeguards, "coupled with the conditions we impose herein," supported a conclusion that Telcordia met the neutrality requirements. *Id.* The Commission also noted that its "rules give us flexibility to consider potential sources of undue influence that might impair neutrality. We have historically addressed such concerns by imposing conditions on the numbering administrators, and we do so here." *Id.* ¶ 181. Using this interpretation, and based on its understanding of the efficacy of safeguards in this context, the FCC concluded "that Telcordia has demonstrated its commitment to maintain neutrality in its LNPA operations, and thus meets our neutrality requirements." *Id.* ¶ 188.

Neustar argues that the FCC's proposed safeguards are insufficient given underlying corporate law principles. Because Telcordia is a Delaware corporation and Delaware law requires that a wholly owned subsidiary's directors are bound to act in the best interests of the sole shareholder, the corporate parent, Neustar asserts that Telcordia, even with safeguards, would be required to act for Ericsson's benefit. In support, Neustar urges that under Delaware corporate law, parent corporations and their wholly owned subsidiaries share complete unity of interest, rendering any biases of a parent to be the shared biases of the subsidiary, which must manage its business in a way that furthers the best interests of the parent.

Neustar premises this argument on Delaware corporate law cases including *Anadarko Petroleum Corp. v. Panhandle Eastern Corp.*, 545 A.2d 1171 (Del. 1988), which holds that "in a parent and wholly-owned subsidiary context, the directors of the subsidiary are obligated only to manage the affairs of the subsidiary in the best interests of the parent and its shareholders." *Id.* at 1174 (citations omitted). Consequently, Neustar asserts Ericsson's biases and alignment should have been evaluated since Telcordia, as a fully owned subsidiary, necessarily shares any of its problematic biases and alignment. Neustar posits that the FCC misunderstood the applicable corporate law and thus misstated the efficacy of potential remedial measures and safeguards against these underlying corporate principles.

In its March 2015 Order, the FCC concluded that members of Telcordia's board of directors each owe fiduciary duties to Telcordia, maintaining a separation that keeps Telcordia from being tainted by any neutrality concerns posed by Ericsson itself. *See March 2015 Order*, FCC 15-35 ¶ 172; *see also id.* ¶¶ 178-79. It is this conclusion that Neustar challenges as an incorrect understanding of and application of Delaware

corporate law principles. Before the Court, the FCC defends the Order on several grounds, including that there is no indication Congress considered corporate law in adopting these requirements and that Neustar's proposed interpretation of Delaware corporate law is impermissibly broad. More specifically, the FCC urges that there is no indication in Delaware case law that safeguards would be ineffective in addressing concerns arising from a subsidiary's fiduciary duties to its parent.

Certainly, Neustar raises legitimate concerns—concerns that might have justified a Commission decision against Telcordia. But we must keep in mind the standard of review for our consideration of Commission decisions. The Court is not to substitute our judgment for that of the FCC. Rather, the question is more narrow, as we determine whether the FCC acted arbitrarily and capriciously. *See U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 696-97 (D.C. Cir. 2016). Neustar itself acknowledges that the interpretation of Delaware law that the FCC adopted—an interpretation premised upon the efficacy of safeguards even in a wholly-owned-subsidiary context—formed the foundation of the FCC's determination in the Order. *See March 2015 Order*, FCC 15-35 ¶ 172. The FCC's understanding of Delaware corporate law principles represents an interpretation of how corporate law informs the FCC's duties and regulations and rejects Neustar's proposed interpretation. This Court cannot find that the FCC's application of corporate law to its regulations, which allowed it to conclude that safeguards are sufficient and that Telcordia's status as a wholly owned subsidiary does not disqualify it from serving as Administrator, is sufficiently incorrect, misguided, or without basis to render it arbitrary and capricious. And, in further support of the FCC's reasonable interpretation, some courts have also rejected Neustar's broad proposed interpretation of *Anadarko*. *See In re Scott Acquisition Corp.*,

344 B.R. 283, 287 (Bankr. D. Del. 2006); *see also First Am. Corp. v. Al-Nahyan*, 17 F. Supp. 2d 10, 26 (D.D.C. 1998); *cf. Case Fin., Inc. v. Alden*, Civ. Action No. 1184-VCP, 2009 WL 2581873, at *7 n.41 (Del. Ch. Aug. 21, 2009). *But see Hamilton Partners, L.P. v. Englard*, 11 A.3d 1180, 1208-09 (Del. Ch. 2010).

For all these reasons, this Court cannot conclude that the FCC's neutrality determination was arbitrary and capricious.

### D. The BAFO Decision and Cost Analysis

Finally, Neustar argues that the FCC erred in that it (1) unjustifiably refused to consider Neustar's second BAFO and (2) premised its cost evaluation on an improper assumption regarding the length of the transition period between Neustar and Telcordia as LNPAs, leading it to conclude improperly that Telcordia's proposal provided a cost advantage.

Neustar contends that the FCC improperly failed to evaluate its second BAFO and that the subcommittee improperly failed to even consider it. Because it posits that its second BAFO was superior to Telcordia's BAFO, Neustar urges that this Court should vacate the FCC's Order.

The FCC deemed the NANC's decision not to consider Neustar's second BAFO "reasonable," *March 2015 Order*, FCC 15-35 ¶ 37, explaining that the governing process had "provided prospective bidders with no right to even a first BAFO, much less multiple BAFOs," *id.* ¶ 42. The request for proposals description framed the possibility of a BAFO solicitation as permissive, using the language "*may* decide to seek," and thus "belies Neustar's claim that it had a reasonable expectation that it would be invited to submit a second BAFO." *Id.* ¶ 42. We agree with the Commission. We are tempted to

ask, what part of "best" and, particularly, of "final" does Neustar not understand?  The bidding process had to come to an end at some point.  Even without the arbitrary and capricious standard of review, it would be difficult to hold that a commission errs by treating a best and final offer as final.

In further support, the FCC highlighted the efficiency reasons for declining another round of offers that would involve "substantial time and effort" to review, given the existing "ample record on which to proceed without another bidding round." *Id.* ¶ 44.  "In these circumstances, the decision to allow another round of bidding and evaluation of those bids had to be weighed against the desire to keep the process moving forward, and we find that, in light of this balancing, the [delegated decisionmaker's] decision . . . not to seek further bids was reasonable." *Id.*  Any guidance it provided on this question, the FCC explained in the Order, was also proper as it only provided oversight to the selection process and remained impartial.  *Id.* ¶ 46.  Especially in light of the FCC's reasoned explanation, this Court could not possibly hold that the decision not to hold an additional round of bidding, and thus to reject Neustar's second and unsolicited BAFO, was arbitrary and capricious.

Neustar argues that the FCC did not find that either bid was qualitatively superior in technical or managerial factors and therefore the determinative inquiry was the cost analysis. To calculate comparative cost, Neustar asserts that the Commission would have to consider not only the relevant price difference between the bids but also the transition costs associated with switching to a new LNPA.  It concludes that the FCC improperly found that transition costs did not obviate the price difference between the bids because the FCC assumed that the transition would require a shorter period of time than

was supported by the record and misapplied the relevant transition costs.

The FCC specifically addressed analysis of transition risks and costs and the parties' technical and management qualifications in its Order. It did "agree with the NANC recommendation that both bidders are qualified to serve as [the] LNPA." *March 2015 Order*, FCC 15-35 ¶¶ 65, 73, 76, 81. But when looking beyond basic competency to the nuanced qualifications, committee "members [had given] Telcordia higher rankings based on its technical and management qualifications." *Id.* ¶ 71. The FCC reiterated, before entering its cost analysis, that despite both bidders' competency to serve as the LNPA, Telcordia was ranked higher for technical and management qualifications and was originally recommended to serve as the next LNPA. *Id.* ¶ 135. The FCC emphasized the importance of technical and management qualifications but further recognized that cost is an important consideration and, when good quality can be achieved at a lower cost, "it is reasonable to take that into account in the analysis of the bids." *Id.* ¶ 138. The Commission accepted its staff's recommendation and review and expressed its confidence "in Telcordia's ability to perform well." *Id.* Thus, while the FCC certainly engaged in a cost analysis, it also clarified in its Order that the determination was not based solely on cost and other qualitative factors had informed its analysis. *See id.* This conclusion further underscores this Court's determination that the FCC's comparison of the bids was not arbitrary and capricious.

As to transition costs in general, the FCC explained that it considered that transition costs would be avoided by maintaining Neustar as the Administrator but reasoned that "competitive selections bring opportunities for lower costs and innovation, and we do not agree that we should maintain the

same LNPA indefinitely merely to avoid transition." *Id.* ¶ 153. It further stated: "There is an inherent trade-off between keeping the same LNPA, which offers predictability and proven experience, and opening up the contract to competition and potentially a new vendor, which can lead to lower costs and innovations." *Id.* ¶ 150. Analyzing the overall context and benefits of the bids led the FCC to conclude that the benefits "outweigh the costs and potential adjustments associated with the transition to a new LNPA." *Id.* ¶ 153. It found this "even assuming that Neustar's estimate of the costs to the industry of transition are correct . . . ." *Id.* In a footnote explaining its cost calculations and analysis, the FCC compared "the two bidders' prices over time, and add[ed] [in] Neustar's estimated costs of transition to the price of Telcordia's bid" to its calculation before making its comparison and ultimate price determination. *Id.* n.535. Review of the FCC's calculations shows that it intended to calculate a high estimated transition cost when explaining the merits of the ultimate recommendation. *Id.* ¶ 153 & n.535. Even using Neustar's high estimates for the sake of argument, the FCC reiterated that Telcordia's bid had merit that "outweigh[ed] the costs and potential adjustments associated with the transition to a new LNPA." *Id.* ¶ 153. For these reasons, this Court cannot conclude that the cost analysis was arbitrary and capricious.

## III.  CONCLUSION

For the reasons set forth above, we conclude that the FCC's process and recommendation were proper exercises of the FCC's authority. We therefore hold that Neustar's petitions for review are

*Denied.*